**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**Filed 10/4/96**

**TENTH CIRCUIT**

_____

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | Nos. 95-6281 and 95-6284 |
| | ) | |
| WILLIAM W. PRETTY, | ) | |
| PATRICIA M. WHITEHEAD, | ) | |
| | ) | |
| Defendants-Appellants. | ) | |

_____

**Appeal from the United States District Court
for the Western District of Oklahoma
(No. CR-94-144-L)**

_____

Fred L. Staggs (C. Merle Gile with him on the briefs), Oklahoma City, Oklahoma, for Defendant-Appellant Pretty.

Susan M. Otto, Federal Public Defender (William P. Earley, Assistant Federal Public Defender, with her on the briefs), Oklahoma City, Oklahoma, for Defendant-Appellant Whitehead.

H. Lee Schmidt, Assistant United States Attorney (Patrick M. Ryan, United States Attorney, with him on the brief), Oklahoma City, Oklahoma, for Plaintiff-Appellee.

_____

**Before ANDERSON, ENGEL,[*] and LOGAN, Circuit Judges.**

_____

[*] The Honorable Albert J. Engel, United States Circuit Judge for the Sixth Circuit Court of Appeals, sitting by designation.

**ENGEL, Circuit Judge.**

_____

Defendants Patricia Whitehead and William Pretty appeal their convictions and sentences arising out of a bribery and money laundering scheme. The government charged that the defendants, with Patrick Kuhse, conspired to take advantage of Whitehead's position in the Office of the Oklahoma State Treasurer ("the Treasurer") by arranging various securities transactions and sharing the commissions earned on those transactions. A jury found Whitehead and Pretty guilty on all counts. We affirm.

I.

The alleged crimes began after Claudette Henry was elected Oklahoma State Treasurer and named Whitehead as Deputy State Treasurer, in January 1991. Whitehead, Pretty, and Kuhse knew each other before this time. In 1990, Whitehead worked at Planner's Independent Management ("PIM"), a securities firm in San Diego. She sold securities and insurance and Kuhse was her supervisor. Whitehead knew Pretty from selling insurance together. The two had formed a corporation, the Professional Business Education Association ("PBEA"), in 1990. Through PBEA, Whitehead and Pretty conducted seminars to train insurance agents and sold videotapes of the seminars. Pretty met Kuhse in 1989, when Pretty was marketing PBEA materials and Kuhse was selling insurance.

As Deputy State Treasurer, Whitehead was the Treasurer's "chief trader," in charge of investing the state's money in low-risk securities. She held a securities license, registered

with PIM, but she was not very experienced in the institutional bond market. She had her license suspended while holding her official position. The Treasurer had several investment policies: each transaction was to be the result of a competitive bidding process among approved brokers; each approved broker was required to have an in-state representative; and no brokerage firm would get more than twenty-five percent of the Treasurer's business within any quarter.

In November 1990, before Whitehead was officially appointed, she called Kuhse in California. Kuhse arranged with Mary Limoges, the president of PIM, to set up an account to do business with the Oklahoma Treasurer. PIM began conducting transactions with the Treasurer in March 1991. PIM used the New York-based Mabon-Nugent as its clearing firm. When the Treasurer wanted to buy or sell securities, PIM would call Mabon-Nugent for a quote and relay that information to the Treasurer. For each transaction, Mabon-Nugent would collect a "clearing fee" and pay PIM, the brokerage firm, a "markup." The markup would be the difference between what the Treasurer paid for the security and what the security cost Mabon-Nugent. PIM's representative would then get some percentage of the markup as a commission on the transaction.

Of all the securities transactions supervised by Whitehead during her tenure with the Treasurer, 6.5% were brokered by PIM. PIM was paid markups by Mabon-Nugent that were no greater than 3/4% of the transaction value, well within the 5% "safe haven" guideline of the National Association of Securities Dealers. As PIM's representative for the Treasurer

3

account, Kuhse received in commissions approximately 90% of the markups paid to PIM in these transactions. About 96% of Kuhse's income during the time of the alleged scheme was from commissions on transactions with the Treasurer, amounting to well over three million dollars. Whitehead knew that Kuhse was PIM's representative and was making commissions, but she testified that she did not know how much he made on these transactions.

During much of this trading, PIM did not have an in-state representative as required by the Treasurer. According to the government, Pretty tried to become PIM's in-state representative, but he did not pass the necessary licensing test. Pretty claims that he sought a securities license merely to assist him in running the PBEA seminars. In any event, Pretty's address and fax number were listed on transaction sheets purporting to name PIM's Oklahoma representative. Pretty forwarded the mail he received in this capacity to PIM in California.

The media began to look into Whitehead's dealings with PIM, and a federal investigation soon followed. The government discovered that in 1990, before the alleged scheme began, Whitehead, Pretty, and Kuhse had made a total of five phone calls to each other; from 1991 to early 1994, during the period of the alleged scheme, the total was 956. Furthermore, the three often made weekend trips together during Whitehead's tenure; the defendants characterize these trips as innocent personal vacations. After the three met in Arizona one weekend early in 1992, the level of the Treasurer's trading through PIM jumped considerably.

4

The government investigation also uncovered numerous financial transactions among Whitehead, Pretty, and Kuhse. According to the government, the transactions were evidence that Whitehead was receiving kickbacks from Kuhse in return for sending business his way, many of which were funneled through Pretty as a middleman. According to the defendants, all of these transactions had a legitimate purpose. For example, Kuhse bought PBEA from Pretty for $600,000. According to the government, PBEA had very little value, and the "sale" was merely a way for Kuhse to funnel money to Pretty and eventually back to Whitehead. An expert testified for Pretty that PBEA was worth more than $600,000 at the time. Other transactions involved real estate. Pretty and his wife bought a house from Whitehead and her husband. Pretty then set up a trust that was funded by Kuhse, and Pretty authorized a loan from the trust to Whitehead to finance the Whiteheads' new house. Pretty wrote several other checks to Whitehead, all of which followed checks written to him by Kuhse. On the other hand, the defendants asserted that much of this money was to repay Whitehead for work she had done while still with PBEA.

The government charged the defendants with three types of crimes: (1) engaging in a bribery or kickback scheme, in violation of 18 U.S.C. § 666; (2) conspiring to engage in this scheme, in violation of 18 U.S.C. § 371; and (3) money laundering, in violation of 18 U.S.C. §§ 1956, 1957. The indictment also sought forfeiture of the proceeds of the scheme under 18 U.S.C. § 982. The jury convicted Whitehead and Pretty of all thirty-two counts in

5

the indictment and found the proceeds to be forfeitable. Each defendant moved for acquittal on the basis of the insufficiency of the evidence, and the court denied these motions.

At the sentencing hearing, the district court considered objections by Whitehead and Pretty to the "amount of loss" calculated in the presentence investigation report. The court sustained the defendants' objections in part and overruled them in part, fixing $3,894,391.28 as the amount to be used in calculating each defendant's sentence. The court also heard objections by both defendants to the imposition of a two-level sentence enhancement for obstruction of justice. The court overruled these objections, finding that both Whitehead and Pretty had committed perjury throughout the trial. Whitehead was sentenced to 108 months' imprisonment and three years' supervised release, and was ordered to forfeit $220,000; Pretty was sentenced to 97 months' imprisonment and three years' supervised release, and was ordered to forfeit $473,471.50.

II.

Whitehead and Pretty argue that the evidence was insufficient to allow the jury to convict them of conspiracy, bribery, and money laundering. While these crimes have different elements, the sufficiency question as to all three turns in large part on whether it was reasonable for the jury to believe that Whitehead, Pretty, and Kuhse entered into the alleged scheme. In reviewing the sufficiency of the evidence, we consider the evidence in the light most favorable to the government and decide whether a rational jury could have found the defendants guilty beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307,

319 (1979); *United States v. Sullivan*, 919 F.2d 1403, 1431 (10th Cir. 1990), *cert. denied*, 506 U.S. 900 (1992).

The government has no direct evidence to prove that the defendants plotted to defraud the Treasurer, but it argues that the circumstantial evidence was enough to show that the superficially legal transactions that occurred among the three acquaintances constituted an illegal kickback scheme. At trial, the government asked the jury to draw the following inferences from the evidence: When Whitehead knew that she would be named the Treasurer's chief trader, she called her friend Kuhse in California, who agreed to start an account for the Treasurer with PIM. Whitehead and Kuhse asked Pretty, who lived in Oklahoma, to serve as the in-state representative. Even though he did not pass the necessary securities exams, he functioned as the in-state representative, forwarding all the mail to California. Whitehead, Pretty, and Kuhse agreed to share Kuhse's commissions on a small scale to check if all would run smoothly. After several transactions were completed without a hitch, the three met in Arizona and decided to move ahead with their plan on a larger scale. From that point on, Kuhse would funnel back portions of his commissions to the other two, sometimes to Whitehead directly and sometimes to Whitehead through Pretty. The transfer of money was occasionally direct, such as when the three split a commission check in thirds, but more often subtle, such as when Kuhse, through Pretty, funded the mortgage trust for Whitehead. Throughout the scheme, the conspirators often talked on the phone to each other to discuss the flow of money among them, and they met on several weekends to solidify their

7

plans. They formulated excuses, such as the allegedly thriving PBEA business, old debts, and the desire to invest in real estate, to make the money transfers look legitimate.

The defendants, on the other hand, focused on the apparent legality of their transactions, asking the jury to accept the following story: Oklahoma made money from its securities trading through PIM, and Kuhse made money from commissions on transactions with the Treasurer just as other licensed representatives doing business with the Treasurer did. All the money that flowed back to Whitehead could be traced to previous debts and arms'-length real estate transactions. There was no connection between the Treasurer's dealings with Kuhse through PIM and Whitehead's real estate dealings with Pretty. The meetings and phone calls were the result of camaraderie, not conspiracy.

The jury believed the government's version of the story, and we hold that there was more than sufficient evidence to support this conclusion. We discuss in turn the sufficiency of the evidence with respect to each of the three types of violations.

### A.

To prove a conspiracy in violation of 18 U.S.C. § 371, the government had to show (1) an agreement to break the law; (2) an overt act furthering the conspiracy's object; (3) that the defendants willfully entered the conspiracy, *United States v. Gacnik*, 50 F.3d 848, 852 (10th Cir. 1995); and (4) that the defendants knew at least the "essential objectives" of the conspiracy, *United States v. Williams*, 923 F.2d 1397, 1402 (10th Cir. 1990), *cert. denied*, 500 U.S. 925 (1991). Circumstantial evidence is sufficient to prove a conspiracy. *E.g.*,

8

*United States v. Fox*, 902 F.2d 1508, 1515 (10th Cir.), *cert. denied*, 498 U.S. 874 (1990). Whitehead and Pretty attack the conspiracy charges by arguing that they did not break the law; that even if they did, there was no agreement to do so; that even if there was, they did not willfully enter the conspiracy; and that they did not know any essential details about the conspiracy.

The government's conspiracy charge rests, as does the whole case, on the circumstantial evidence showing that the scheme existed; there is no direct proof that the defendants agreed to any plan or that they knew the essential details of the plan. Deciding whether there was a conspiracy is tantamount to deciding whether there was a scheme at all. Having found sufficient evidence to support the finding that the scheme existed, we have no trouble finding that the evidence supports the conspiracy charges. The scheme was an agreement requiring willful participation and overt acts by all three members. Whitehead argues that even if Pretty and Kuhse had a scheme going, she was not a participant. We reject this argument, because Pretty and Kuhse could not have had a scheme without Whitehead's willful participation--Pretty and Kuhse would not have funneled money to Whitehead if Whitehead had not been involved in the scheme.

B.

The defendants argue that even if they were involved in some sort of scheme, there was no evidence that they violated 18 U.S.C. § 666. They contend that the government failed to prove that the Treasurer annually received more than $10,000 in federal funds, as required

9

by the statute. Whitehead also argues that she should not have been convicted under this statute because there was no evidence that her official decision-making was improperly influenced. The government responds that it is necessary under § 666 to prove neither that the Treasurer received federal funds nor that Whitehead's decisions were influenced.

Section 666 prohibits any "agent of an organization, or of a State, local, or Indian tribal government, or any agency[1] thereof" from accepting bribes "intending to be influenced" in connection with any transactions involving anything of value of $5,000 or more, and any person from offering such bribes "with intent to influence" any such transactions. 18 U.S.C. § 666(a). These prohibitions exist only if the organization, government, or government agency of which the bribe-taker is an agent annually "benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance."
*Id.* § 666(b).

There is no dispute that federal funds exceeding $10,000 a year come through the Oklahoma State Treasurer's Office, but Whitehead and Pretty argue that there is no evidence that the Treasurer "benefits" from this money in the sense required by the statute. They cite testimony that the federal funds come from federal agencies earmarked for use by state agencies and are deposited into a "general account" from which they are withdrawn at the

---

[1] A government "agency" includes any subdivision of the executive, legislative, judicial, or other branch of government, 18 U.S.C. § 666(d)(2), so the Oklahoma State Treasurer's Office is an "agency" under the statute.

state agencies' discretion. They are not used by the Treasurer and therefore do not qualify under § 666(b), the defendants posit. The government counters that there is no need to show that the *Treasury* benefits from the federal funds, because Whitehead was an agent of the *state* itself.

If Whitehead was an agent of the state, rather than only of the Treasurer, then § 666 applies to her even if the Treasurer did not benefit from the federal funds, because the state itself received and benefited from more than $10,000 in federal funds. The statutory definition of "agent" is "a person authorized to act on behalf of another person or a government." *Id.* § 666(d)(1). Because Whitehead was in charge of investing the state's funds, not merely the Treasurer's funds, we find that she was indeed an agent of the state. Even if the actual money she traded through PIM could not be traced to a federal program, she was chargeable under § 666. *See United States v. Westmoreland*, 841 F.2d 572, 576 (5th Cir.), *cert. denied*, 488 U.S. 820 (1988).

In response to Whitehead's argument that no evidence supported an inference that her official decision-making was influenced by any bribery or kickbacks, the government correctly points out that the statute requires only intent to be influenced, rather than actual influence. 18 U.S.C. § 666(a)(1)(B). Having found that the scheme existed as alleged, we find in turn that Whitehead intended to be influenced, because the whole plan hinged on her sending business to PIM.

C.

11

Both defendants challenge the sufficiency of the evidence for their money laundering convictions under 18 U.S.C. §§ 1956-1957. Pretty was convicted on four counts under § 1957(a); he and Whitehead were convicted on one count under § 1956(a)(1)(A)(i) and on two counts under § 1956(a)(1)(B)(i). The government argues that the same evidence that allows the reasonable inference that the scheme existed also allows the inference that Whitehead and Pretty engaged in money laundering.

> Section 1957 punishes the knowing
>
> engage[ment] in a monetary transaction in criminally derived property that is of value greater than $10,000 and is derived from specified unlawful activity
> . . . .

18 U.S.C. § 1957(a). The government based the charges under this section on Pretty's purchase of two cars, an apartment complex, and a house with money derived from the scheme. Pretty admits making the purchases; he challenges the convictions by arguing that the money he used was not criminally derived. Having found that the evidence of the existence of the conspiracy was sufficient, we also find that the evidence was sufficient to support these § 1957 counts, because the timing of Pretty's purchases strongly suggests that he used money from the scheme.

Section 1956 prohibits financial transactions involving the proceeds of unlawful activity if either (1) the intent of the transaction is "to promote the carrying on of specified unlawful activity," § 1956(a)(1)(A)(i), or (2) the individual knows that the transaction is designed in whole or in part "to conceal or disguise the nature, the location, the source, the

12

ownership, or the control of the proceeds of specified unlawful activity," § 1956(a)(1)(B)(i). The charge under § 1956(a)(1)(A)(i) is based on the purchase by Pretty and his wife of a house from Whitehead and her husband. Whitehead testified that she wanted to sell the house, and Pretty testified that he was interested in buying and restoring old homes. The government's theory is that this transaction was an example of Pretty's kicking money from Kuhse's commissions back to Whitehead. This transfer of money, it contends, promoted the illegal scheme and therefore constituted money laundering. The defendants claim that the government failed to prove that the intent behind the transaction was the promotion of the scheme. Again, this issue comes down to whether there was a scheme at all. Finding that the evidence was sufficient to support the jury's finding that the scheme existed, we also find that the jury's inference that this allegedly arms'-length transaction was in fact meant to promote the scheme was a reasonable one.

The charges under § 1956(a)(1)(B)(i) are based on a trust set up by Pretty and funded by Kuhse. Pretty approved a loan to Whitehead and her husband from this trust to finance the Whiteheads' new house. The defendants claim that the transactions were negotiated at arms' length. We find that the jury's inference that the intent of these transactions was at least in part to conceal the source of the funds was a reasonable one.

Whitehead argues that these transactions cannot be the basis of § 1956(a)(1)(B)(i) liability because they were part and parcel of the kickback scheme. The indictment cites the § 666 violations as the "specified unlawful activity" of which the proceeds were laundered.

13

Whitehead relies on our comment in *United States v. Edgmon*, 952 F.2d 1206 (10th Cir. 1991), *cert. denied*, 505 U.S. 1223 (1992), that "Congress aimed the crime of money laundering at conduct that *follows in time* the underlying crime rather than to afford an alternative means of punishing the prior `specified unlawful activity.'" *Id.* at 1214 (emphasis added). According to Whitehead, because the real estate transactions in question were themselves kickbacks in violation of § 666, they did not "follow in time" the underlying § 666 violations.

The "follows in time" language does not bear the weight that Whitehead places upon it. In *Edgmon*, we considered whether a conviction for both conversion and money laundering violated the Double Jeopardy Clause. Examining the legislative history of the Money Laundering Crimes Act of 1986, we found that because Congress intended to make a new, separately punishable offense, the conviction did not pose a double jeopardy problem. *Id.* at 1212-14. Our "follows in time" comment was intended to express merely the separateness of money laundering and the underlying crime for double jeopardy purposes, not a strict temporal relationship. In *United States v. Lovett*, 964 F.2d 1029 (10th Cir.), *cert. denied*, 506 U.S. 857 (1992), we quoted the "follows in time" language, again to support the proposition that a conviction for money laundering and the underlying crime did not violate the Double Jeopardy Clause. *Id.* at 1042. In *United States v. Dimeck*, 24 F.3d 1239 (10th Cir. 1994), to support our holding that the mere delivery of money from one drug courier to another, without evidence of concealment, is not sufficient to constitute money laundering,

14

we again cited this same language. *Id.* at 1246. In a footnote, however, we commented that "[w]e could envision scenarios where money laundering and the underlying illegal activity occur simultaneously." *Id.* at 1246 n.12.

Classic examples of § 1956(a)(1)(B)(i) violations involve drug dealers who receive tainted money and then try to "launder" it by using it in apparently legitimate transactions. *See United States v. Garcia-Emanuel*, 14 F.3d 1469, 1477 (10th Cir. 1994). In such situations, the laundering naturally occurs after the underlying drug crime is complete. Section 1956 covers far more than merely "classic" money laundering, however. *United States v. Johnson*, 971 F.2d 562, 569 (10th Cir. 1992). We do not read our cases as holding that laundering can occur only after the underlying crime is complete, especially in light of the *Dimeck* footnote. The legislative history at the root of the "follows in time" language in *Edgmon* notes that money laundering is a new crime; this supported our holding that a separate punishment did not violate the Double Jeopardy Clause. The legislative history does not suggest even obliquely that a certain temporal relationship must exist between the underlying crime and the money laundering. *See* S. Rep. No. 433, 99th Cong., 2d Sess. (1986). Rather, it stresses the wide scope of money laundering and notes the complexity of schemes in which criminals "disguise the illegal nature and true sources of their income." *Id.* at 3. This is exactly what Whitehead did in having her kickback filtered through real estate transactions. A direct payment from Kuhse to Whitehead would have violated § 666 without constituting money laundering. The effort to disguise the source of the money was

an additional act that is separately punishable under § 1956(a)(1)(B)(i), notwithstanding the simultaneity of the two crimes.

Even if we were to hold that money laundering must without exception follow in time the underlying "specified unlawful activity," we would affirm Whitehead's § 1956(a)(1)(B)(i) convictions. The unlawful activity specified in counts 25 and 26 was simply the defendants' violation of § 666--the indictment did not cite any particular § 666 violations as the predicate for the money laundering charges. The laundering transactions relevant to counts 25 and 26 began to unfold in March 1992. At that time, Whitehead had already completed the conduct charged in counts 3, 5, 7, and 8, all in violation of § 666. Therefore, the money laundering "followed in time" the underlying crime.

This analysis accords with our holding in *United States v. Kennedy*, 64 F.3d 1465 (10th Cir. 1995). The defendant in that case had been convicted of laundering the proceeds of several instances of mail fraud. He argued that because the conduct constituting the mail fraud crimes was the same as that alleged in the money laundering counts, the predicate crimes had not been completed at the time of the laundering. We affirmed his conviction because some of the underlying mail fraud had taken place before any of the money laundering. *Id.* at 1477-78. We distinguished *Johnson*, in which the only crimes underlying the defendant's money laundering charges were the very same wire transfers in which the alleged money laundering occurred. Whitehead's case is analogous to *Kennedy* rather than to *Johnson*.

16

III.

Both defendants argue that the district court erred in enhancing the base levels of their sentences by two based on obstruction of justice. We review the district court's factual findings on this issue under the clearly erroneous standard, *United States v. Urbanek*, 930 F.2d 1512, 1514 (10th Cir. 1991), and its legal conclusions de novo, *United States v. Blair*, 54 F.3d 639, 644 (10th Cir.), *cert. denied*, 116 S. Ct. 220 (1995).

The Sentencing Guidelines provide that a defendant's offense level must be increased by two "[i]f the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense." U.S.S.G. § 3C1.1. Perjury can be the basis for such an enhancement. *Id.* § 3C1.1, comment. (n.3(b)). A defendant commits perjury for the purposes of this Guideline if he "gives false testimony concerning a material matter with the willful intent to provide false testimony." *United States v. Dunnigan*, 507 U.S. 87, 94 (1993).

The district court explicitly found that both defendants had committed multiple acts of perjury. It found that almost all of Whitehead's testimony at trial was false, including her testimony as to her intent in the real estate transactions. (Tr. 1402-03; Order of July 28, 1995 at 5.) As to Pretty, it found that he lied about, among other things, the real estate transactions and the reasons for the sale of PBEA. (Tr. 1454-56; Order of July 28, 1995 at 5.) These findings satisfied the requirements of the Guidelines and *Dunnigan*, and we see no error in them.

17

Whitehead argues that the district court was too conclusory in finding that she intended to commit perjury. Careful not to allow overly conclusory findings that a defendant obstructed justice by committing perjury, we have required judges to identify or describe the perjurious testimony in circumstances such as these. *United States v. Massey*, 48 F.3d 1560, 1573 (10th Cir.), *cert. denied*, 115 S. Ct. 2628 (1995). Once this requirement is met, however, "fairly conclusory findings that such testimony was . . . given with intent to commit perjury" are permissible. *Id.* at 1574. The court did not quote the perjurious testimony of Pretty and Whitehead, but it did not need to do so. It specified the particular areas in which the defendants committed perjury with enough precision to satisfy *Massey*.

IV.

Whitehead and Pretty argue that the district court erred in increasing the base levels of their offenses by thirteen based on the amount of money involved. The court considered the defendants' objections to the $6,749,883.91 "amount of loss" mentioned in the presentence investigation report. Pretty argued that he should be credited with the amount of money that he paid Whitehead. Whitehead argued that she did not cause the state of Oklahoma to lose any money at all. The court sustained the defendants' objections in part and overruled them in part, fixing $3,894,391.28 as the "amount of loss" to be used in calculating the sentence for each defendant. We review the court's factual findings under the clearly erroneous standard and its legal conclusions de novo. *United States v. Whitehead*, 912 F.2d 448, 449-50 (10th Cir. 1990).

18

The Guidelines provide for an increase in the offense level for bribery if

> the value of the payment, the benefit received or to be received in return for the payment, or the loss to the government from the offense, whichever is greatest, exceeded $2,000.

U.S.S.G. § 2C1.1(b)(2)(A). The court used the benefit received by Kuhse as a benchmark. It found that Kuhse made $4,056,657.58 from commissions with PIM over the relevant time period. Citing testimony that 96% of this money was from trades with the Oklahoma Treasurer, the court reached the $3,894,391.28 figure, which increased each defendant's offense level by thirteen. *Id.* § 2F1.1(b)(1)(N). Whitehead argues that she should be sentenced based on the amount of money that she received, $268,950.90, which would increase her offense level by only eight. *Id.* § 2F1.1(b)(1)(I). Pretty argues similarly that his sentence should be based on the amount he received, $1,061,581.04, which would increase his level by eleven. *Id.* § 2F1.1(b)(1)(L).

All parties agree that the issue turns on whether the amount of money received by Kuhse was reasonably foreseeable to the defendants. *Id.* § 1B1.3(a)(1)(B). The defendants claim that they could reasonably foresee only the amount that they personally received. The commentary to the Guidelines cautions that the relevant conduct for setting the offense level is not necessarily the same for each member of a conspiracy. *Id.* § 1B1.3, comment. (n.2). Still, this note does not mean that only the amount received by each individual conspirator may be used to calculate that conspirator's sentence; rather, the question is whether the amount received by Kuhse was reasonably foreseeable to the defendants in light of the nature

19

of the conspiracy. *See United States v. Torres*, 53 F.3d 1129, 1144 (10th Cir.), *cert. denied*, 115 S. Ct. 2599 (1995).

Although the defendants argue that there was no evidence of the foreseeability to them of the amount of money Kuhse received, the nature of the conspiracy was such that each participant almost certainly knew how much money was going where; the scheme was based on keeping track of money flowing from one conspirator to another. The district court explicitly found that the amount of $3,894,391.28 was foreseeable both to Whitehead, (Order of July 28, 1995 at 3 n.5), and to Pretty, (Order of July 28, 1995 at 6 n.8). We see no reason to hold that these findings were clearly erroneous.

V.

For the foregoing reasons, we AFFIRM the judgment of the district court.