**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUL 9 1999**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

STEVEN L. SCHLUNEGER,

      Defendant - Appellant.

No. 98-5200

**Appeal from the United States District Court**
**for the Northern District of Oklahoma**
**(D.C. No. 97-CR-98-C)**

Submitted on the briefs:

Robert G. Green, Tulsa, Oklahoma, for Defendant-Appellant.

Stephen C. Lewis, United States Attorney, Tulsa, Oklahoma, and Gordon B. Cecil, Special Assistance United States Attorney, Muskogee, Oklahoma, for Plaintiff-Appellee.

Before **TACHA, MAGILL,**[*] and **BRISCOE,** Circuit Judges.

**MAGILL,** Circuit Judge.

---

[*]Honorable Frank Magill, Senior Circuit Judge, United States Court of Appeals for the Eighth Circuit, sitting by designation.

A jury convicted Stephen Schluneger on one count of conspiracy to defraud the government. The district court denied Schluneger's motions for a judgment of acquittal and for a new trial, and sentenced Schluneger to twelve months' imprisonment. Schluneger appeals both his conviction and his sentence. We affirm.

## I.

In February 1988 the United States Army Corps of Engineers (Corps) awarded a $1.8 million contract to Frank Minelli, doing business as Swiss Craft Professional Painters, for sandblasting and painting various locks and dams along the Arkansas River (Minelli contract). As a condition of the contract, Minelli was required to provide the Corps with payment and performance bonds. Thomas Rhoades and Schluneger furnished the bonds as sureties in case Minelli defaulted on the government contract.

Minelli eventually defaulted on the contract, and on July 18, 1989, the Corps terminated him as the contractor. The Corps then demanded that Rhoades and Schluneger satisfy their obligations and liability under the terms of the bonds. The unpaid balance at the time of termination was approximately $1.69 million. Under the bonds' terms and relevant federal acquisition regulations, Rhoades and Schluneger had three options: complete the work with a contractor of their choice

that was acceptable to the government, complete the work with their own resources, or discharge their liability under the bond by payment to the government. Rhoades and Schluneger opted to complete the work with a contractor of their choice.

Rhoades and Schluneger subsequently accepted a bid from Skyline Painting, Inc. (Skyline) to complete the work on the Minelli contract for $1.2 million. On August 4, 1989, Rhoades and Schluneger informed the Corps of their intent to have Skyline finish the contract and asked to sign a takeover agreement. The Takeover Agreement, as executed by Rhoades and Schluneger with the Corps, restricted Rhoades and Schluneger from receiving any compensation for the work performed except for "actual costs and expenses incurred in the completion of the work." Takeover Agreement at ¶ 8. The Takeover Agreement provided that Rhoades and Schluneger were not to be compensated for "any amount in excess of [their] total expenditures necessarily made in completing the work and discharging" their liability under the performance bond. Id. at ¶ 10. The Takeover Agreement was eventually signed on August 14, 1989.

Between the time they notified the Corps of their intent to have Skyline finish the Minelli contract and the time they signed the Takeover Agreement, Rhoades and Schluneger entered into a series of agreements, not disclosed to the Corps, which had the intent and effect of billing the government for more than

their actual costs and expenses. Although Skyline's bid to complete the Minelli contract was $1.2 million, Rhoades and Schluneger requested that Skyline sign an agreement (Skyline Subcontract), prepared by attorney T. Robert Hughes, stating that Skyline would complete the work for the "agreed contract price of $1,690,000," the entire amount remaining on the Minelli contract. Skyline Subcontract at 1. This agreement was signed on August 10, 1989.

Skyline understood, however, that it was to receive only $1.2 million, and that the difference was to be paid to Rhoades and Schluneger as finder's fees and engineering consulting fees. Although Skyline believed these fees to be legitimate, in fact they were bogus, and, as the evidence at trial showed, neither Schluneger nor his associates ever performed any consulting work. This fee arrangement was memorialized in another agreement, prepared by Hughes and signed on the same day as the Skyline Subcontract, obligating Skyline to pay to ARCO Business Services, Ltd., a business trust administered by Hughes, finder's fees and engineering consulting fees (Skyline/ARCO Fee Agreement). Under this agreement, Skyline would pay ARCO Business Services approximately twenty-nine percent of each progress payment paid by the government to Skyline during the course of the work, plus any remaining amounts paid by the government to Skyline in excess of $1.2 million.

On August 14, 1989, Rhoades and Schluneger signed the Takeover Agreement. They did not disclose to the Corps either the arrangement for finder's fees and consulting fees or Skyline's initial bid to complete the work for $1.2 million.

Before Skyline commenced work on the project, Hughes prepared another agreement (ARCO/Rhoades Fee Agreement), on August 18, 1989, obligating ARCO Properties, Ltd. (another Hughes business trust) to pay kickbacks to Rhoades equal to fifty percent of all money received by ARCO Business Services under the Skyline/ARCO Fee Agreement.

The payment scheme, which took place over the next three years, was carried out in the following manner: Nancy Norvell, president of Skyline, prepared all requests for progress payments, which included the bogus finder's fees and engineering fees. She included these fees in her progress reports based on the misrepresentations by Rhoades and Schluneger that they were incurring costs and expenses to ARCO Business Services in their performance of the government contract. Norvell submitted these progress payment requests to Rhoades who reviewed and approved them. Rhoades then sent the requests for payment to the Corps.

Payments were mailed to Rhoades and made jointly payable to Rhoades and Schluneger. After obtaining Schluneger's endorsement, Rhoades usually made

disbursements to Skyline. Skyline then made disbursements to ARCO Business Services, which in turn made disbursements to ARCO Properties. Both ARCO companies made kickback payments to Rhoades, Schluneger and Rhoades's spouse. Schluneger received about $38,000 throughout the course of the scheme. The scheme was uncovered when Skyline abandoned the project due to financial problems, and Rhoades and Schluneger defaulted on the contract.

The government indicted Schluneger, Rhoades, Hughes, ARCO Business Services and ARCO Properties each on one count of conspiracy to defraud the government. The jury returned guilty verdicts against all defendants.[1] Schluneger and the other defendants moved for judgments of acquittal and a new trial. The district court denied all motions. Schluneger was subsequently sentenced to twelve months' imprisonment and three years' supervised release, and was ordered to pay $10,000 in restitution.

## II.

Schluneger argues that the district court erred in denying his motion for a judgment of acquittal or alternatively for a new trial. We review the district court's decision to deny a motion for a new trial for an abuse of discretion. See

---

[1]Rhoades died on June 21, 1998. On August 3, 1998, the government moved to dismiss the indictment against Rhoades. By special verdict, the jury found that ARCO Business Services withdrew from the conspiracy in June 1992.

United States v. Byrne, 171 F.3d 1231, 1235 (10th Cir. 1999). We review de novo the district court's decision to deny a motion for judgment of acquittal. See United States v. Janusz, 135 F.3d 1319, 1323 (10th Cir. 1998). When applying de novo review, this Court views the evidence in the light most favorable to the government and asks whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. (quotation marks omitted) (emphasis in original).

## A.

Schluneger first argues there was insufficient evidence to convict him of conspiracy to defraud the government. We disagree.

It does appear from the record that Schluneger was not involved in creating the two Fee Agreements (the Skyline/ARCO Fee Agreement and the ARCO/Rhoades Fee Agreement). Nevertheless, there is more than sufficient other evidence demonstrating Schluneger's participation in the conspiracy to overcharge the government. Schluneger signed the Takeover Agreement, limiting himself and Rhoades to actual costs and expenses. He also signed the Skyline Subcontract, which stated that the amount necessary to complete the work would be $1,690,000, even though the Skyline bid was for $1,200,000. Finally, he received $38,000 from Rhoades for work he did not do, even though he knew he was to be paid only for actual costs and expenses. Schluneger knew that the

amount remaining on Minelli's contract was $1,690,000. If Skyline were to be paid the full $1,690,000, then there would have been no money for distribution to him and Rhoades.[2] Thus, even if Schluneger did not personally participate in creating the Fee Agreements, a reasonable jury could find that he was aware of the agreements and that he participated in the scheme to defraud.

Schluneger also argues that, because he and Rhoades were subrogated to Minelli as sureties, they were entitled to recover the full price of the original contract with the government. Thus, he contends, as a matter of law there was no fraud. This argument is without merit. Schluneger ignores the fundamental nature of the conspiracy -- that he and the other defendants submitted an inflated bid to be paid for services that they were not performing. Rhoades and Schluneger chose to enter into the Takeover Agreement and complete the work with a subcontractor and bound themselves to recover only their actual costs and expenses, which were $1.2 million under the initial Skyline bid. They were not entitled to anything more.

Thus, viewing the evidence in the light most favorable to the government, there was sufficient evidence for the jury to convict Schluneger. The district

---

[2]In addition, Schluneger participated in a later agreement (unrelated to the case at hand) which amended portions of the Skyline Subcontract. This agreement referred to the Skyline/ARCO Fee Agreement "for the furnishing to Skyline of engineering and consulting services." Appellant's App. at 766.

court properly denied the motions for judgment of acquittal and the motion for a new trial.

**B.**

Schluneger next claims that the district court erred in refusing to admit certain evidence during his cross-examination of one of the government's witnesses. The evidence related to previous bids made on the contract (at the time of Minelli's bid) and the government's estimates at that time of what the project would cost to complete. At trial, Schluneger attempted to argue that he and Rhoades relied on these earlier bids in submitting the Skyline Subcontract for $1.69 million and that this reliance demonstrated good faith and lack of criminal intent. However, it is irrelevant whether they in fact relied on any earlier bids, as this evidence does not negate the fact that he and Rhoades agreed in the Takeover Agreement not to recover anything above their actual costs and expenses. Thus, the district court did not abuse its discretion in refusing to admit this evidence. See United States v. Lugo, 170 F.3d 996, 1005 (10th Cir. 1999) (standard of review).

**III.**

At sentencing, the district court applied the appropriate fraud guideline, U.S.S.G. § 2F1.1. The court assigned a base offense level of six and added nine levels because the amount of the loss was $490,000 (the difference between the Skyline bid and the amount remaining on the Minelli contract). See U.S.S.G. § 2F1.1(a)-(b). The court then added two levels for more than minimal planning under § 2F1.1(b)(2). Finally, the court gave Schluneger a four point downward departure under § 3B1.2(a) for being a minimal participant. The final offense level was thirteen.

Schluneger challenges his sentence on two grounds. First, he argues he should not be held responsible for the entire amount of the loss. Second, he argues he should not have received a two level increase for more than minimal planning because he received a reduction for being a minimal participant. We review the district court's application of the sentencing guidelines de novo and its factual findings for clear error. See United States v. Pretty, 98 F.3d 1213, 1222 (10th Cir. 1996).

**A.**

In a conspiracy case, loss is calculated "on the basis of all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid

detection or responsibility for that offense." United States v. Brown, 164 F.3d

518, 522 (10th Cir. 1998) (quotation marks omitted); see also Pretty, 98 F.3d at

1222; U.S.S.G. § 1B1.3(a)(1)(A).

Schluneger argues that, in calculating the loss, the district court should

have considered his relative role in the conspiracy. See United States v. Melton,

131 F.3d 1400, 1404 (10th Cir. 1997) ("the court must keep in mind that 'the

scope of the criminal activity jointly undertaken by the defendant . . . is not

necessarily the same as the scope of the entire conspiracy'" (alteration in original)

(quoting U.S.S.G. § 1B1.3, comment. (n.2))). Because he was not a party to the

creation of the Fee Agreements, he argues, he was unaware that the intended loss

was $490,000.

Schluneger's argument is unavailing. This is not a case where a

defendant's coconspirators engaged in acts to which the defendant did not agree

or about which the defendant did not know. See Melton, 131 F.3d at 1404-06

(holding $30 million loss not attributable to defendant where defendant never

agreed to criminal activity undertaken after his arrest). Here, Schluneger agreed

with his coconspirators to defraud the government on the Skyline subcontract. He

knew of both the original Skyline bid and the submitted inflated bid. He was also

receiving money for work he did not do and which the Takeover Agreement did

not permit. The fact that he did not know exactly how the $490,000 was to be

distributed is irrelevant. The district court thus correctly applied the guidelines in calculating the amount of loss.[3]

**B.**

Under U.S.S.G. § 2F1.1, the court may increase the offense level by two levels if the offense involved more than minimal planning. More than minimal planning exists where "there are repeated acts over a period of time, unless it is clear that each instance is purely opportune." United States v. Copus, 110 F.3d 1529, 1537 (10th Cir. 1997); see U.S.S.G. § 1B1.1 comment. (n.1(f)).

The district court properly awarded the increase in this case because the offense involved a series of repeated acts over period of three years -- forming the various agreements, submitting the progress reports, and cashing the checks -- which were not purely opportune. See United States v. Wise, 990 F.2d 1545, 1550-51 (10th Cir. 1992) (more than minimal planning increase appropriate where defendant executed five notes and submitted twelve false draw letters in order to obtain money). Schluneger argues that the increase for more than minimal

---

[3]At sentencing, Schluneger also objected on the ground that the actual loss was only approximately $200,000 and that this should be the amount calculated for sentencing purposes. The district court properly rejected this argument, as the amount of loss is the greater of the actual or intended loss. See United States v. Banta, 127 F.3d 982, 983 (10th Cir. 1997).

planning is inconsistent with the downward departure he received for being a "minimal participant." See U.S.S.G. § 3B1.2 (mitigating role adjustment). We disagree.

Schluneger's argument overlooks the fact that the two provisions measure different aspects of the concerted criminal activity: the minimal participant inquiry is a measure of the participant's role in the concerted criminal activity, whereas the more than minimal planning inquiry is a measure of the extent or nature of the criminal activity itself. Cf. United States v. Massey, 48 F.3d 1560, 1570 (10th Cir. 1995) (holding that increases for more than minimal planning and aggravating role adjustments under U.S.S.G. § 3B1.1 were not double counting because they "address different concerns. The adjustment for more than minimal planning was intended to distinguish between relatively simple crimes and more sophisticated ones. On the other hand, the adjustment for role in the offense[] addresses concerns about the relative responsibilities of those involved in the commission of the offense . . . ." (citations and quotation marks omitted)). Thus, the district court did not abuse its discretion in imposing this increase.


**IV.**

For the foregoing reasons, we AFFIRM the decision of the district court.