**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAY 24 2001**

**PATRICK FISHER**
Clerk

**PUBLISH**

# UNITED STATES COURT OF APPEALS
## TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

AVRAHAM BEN-ZION HABER,

    Defendant-Appellant,

No. 99-4088

---

Appeal from the United States District Court
for the District of Utah
(D.C. No. 95-CR-200-S)

---

Submitted On The Briefs:

Michael G. Katz, Federal Public Defender, and Jenine Jensen, Assistant Federal Public Defender, Denver, Colorado, for Defendant-Appellant.

Paul M. Warner, United States Attorney, Scott J. Thorley, Assistant United States Attorney, and Mark Y. Hirata, Assistant United States Attorney, Salt Lake City, Utah, for Plaintiff-Appellee.

---

Before **SEYMOUR**, **BALDOCK** and **LUCERO**, Circuit Judges.

---

**SEYMOUR**, Circuit Judge.

Following a jury trial, Avraham Ben-Zion Haber was convicted of mail fraud in violation of 18 U.S.C. § 1341 and wire fraud in violation of 18 U.S.C. § 1343. The district court sentenced him to forty-six months in prison, followed by three years of supervised release. Mr. Haber raises five arguments on appeal, claiming the district court committed reversible error by (1) denying his motion for acquittal on fraud claims related to disability insurance; (2) failing to give a jury instruction on unanimity; (3) failing to have the court reporter transcribe certain bench conferences; (4) imposing a sentence enhancement for abusing a position of trust; and (5) increasing his base offense level based on its finding that the "intended loss" from his offenses exceeded $800,000. We affirm the conviction and sentence.[1]

# I

Mr. Haber, a Utah resident, was born and raised in Israel. In 1992, he told Eugenia and Jafar Chafi, friends who also lived in Utah, that there was a great deal of building construction going on in Israel. He explained to them that he was the exclusive distributor for several window and door manufacturers and that he

---

[1] After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

had many important contacts with Israeli architects, developers and builders of upscale high-rises and condominiums. Mr. Haber proposed that the Chafis invest in an export business that he would form to sell windows and doors in Israel. They agreed, and signed a contract with Mr. Haber to form a company called Visions International. Mr. Haber was to own a seventy percent interest, and the Chafis would invest $45,000 in return for a thirty percent interest.

In the agreement, Mr. Haber promised to incorporate Visions International in Utah and register it in Israel. He represented to the Chafis that their money would be used to open a corporate bank account in their name in Israel, which he claimed required a minimum opening deposit of $12,000, and to retain Israeli legal counsel and an accountant. Mr. Haber agreed to be responsible for all Israeli business operations and promised to secure orders for the windows and doors from his existing Israeli contacts, to market the products and to seek new business contracts. Mr. Haber represented to the Chafis that the Visions International products had already been tested and approved for sale by the Israeli government.

Over the next few months, Mr. Haber told the Chafis that Visions International had supplied the windows and doors for a major building project in Israel, was shipping thousands of doors and windows to Israel for installation, was making substantial profits, and had $1 million in its bank account. He also

told them he planned to open a window and door assembly factory in Israel, and he represented that he was familiar with the incentives and subsidies available from the Israeli government to assist in securing the factory site. From August 1992 until October 1993, the Chafis gave Mr. Haber a total of $137,000. He told them this money would assist in operating the business and securing a factory site, and he increased their ownership in Visions International to fifty percent in return.

The Chafis began to question Mr. Haber in early 1993 about how their money was being spent and when they would begin receiving returns on their investment. He told them the profits had to remain in an Israeli bank account in order to pay taxes and to obtain Israeli assistance in building the factory. In the spring of 1993, the Chafis traveled to Israel to tour the factory site. Mr. Haber continually put off meeting with them and claimed to be unable to give them directions to the factory site. Eventually the Chafis returned home.

Jeanne Corwin owned a marketing business in North Carolina and traveled frequently to Israel. Mr. Haber became acquainted with her while in Israel in late 1992. He told her that he owned Visions International in partnership with an individual investor who owned ten percent and a major window manufacturer that owned two percent. He also represented to her that he was the exclusive distributor in Israel for several window and door manufacturers and that he was

building a window and door factory. At one point, Mr. Haber took Ms. Corwin to an industrial park, telling her it was to be the factory site. Ms. Corwin gave Mr. Haber $125,000, and in exchange he promised her a twenty percent ownership interest in Visions International. During 1992 and 1993, Haber told both the Chafis and Ms. Corwin that Visions International had ongoing sales of windows and doors in Israel and that construction on the factory was proceeding well. Ms. Corwin later gave Mr. Haber an additional $44,950 to purchase door manufacturing machines.

Despite these many representations, in truth Mr. Haber simply converted the Chafis' and Ms. Corwin's money for his own personal use. He deposited their funds into his personal bank accounts and used the money to pay living expenses and to repay a personal loan from his father-in-law. He never incorporated Visions International, opened a bank account, nor obtained legal counsel or an accountant for its purported business. Neither Mr. Haber nor Visions International was an exclusive distributor for the claimed window and door manufacturers, and no window manufacturer had invested in Visions International. The Israeli government had not approved any windows or doors from Mr. Haber or Visions International for sale. In fact, other than some minor sample shipments to Israel for testing purposes, neither Mr. Haber nor the sham Visions International ever shipped windows or doors to Israel, sold any product,

-5-

or entered into any contract in Israel or elsewhere. Mr. Haber never purchased property or began construction of a factory.

Mr. Haber did, however, apply for disability insurance to protect his income from the nonexistent company. In his application to the Equitable Life Assurance Society, he claimed to be a self-employed owner of a business that sold large quantities of windows and doors to local and foreign governments. To meet Equitable Life's minimum income threshold, Mr. Haber stated that he had a current income of $121,000 and that his prior year's income was $120,000. In fact, Mr. Haber had no source of income other than the monies he received from the Visions International investors. The day after his disability insurance policy went into effect, Mr. Haber injured his elbow and filed a disability claim. [2] He claimed his prior income level entitled him to $5,000 a month in disability benefits. Equitable Life paid Mr. Haber four monthly payments of $5,000 but later challenged his represented income. Mr. Haber provided the insurer with a letter from his bank stating that his 1992 deposits totaled $129,750 and his 1993 deposits totaled $145,750. Despite this evidence, Equitable Life eventually determined Mr. Haber had falsely represented that his income met the policy requirements and it rescinded the policy.

---

[2] Despite the fortuitous timing, the fact that Mr. Haber suffered a serious injury is not in dispute.

## II

### A. *Equitable Life Mail Fraud Counts*

Mr. Haber was found guilty of mail fraud based upon his misrepresentations to Equitable Life in connection with his disability insurance policy. He argues the evidence was insufficient to show his dealings with Equitable Life were part of a common scheme to defraud the Visions International investors, and he contends the district court erred in denying his motion for a judgment of acquittal based on this argument. Mr. Haber had previously moved unsuccessfully to sever these counts from the indictment.

There are three components to a violation of the mail fraud statute: "(1) the devising of a scheme or artifice either (a) to defraud or (b) for obtaining money by means of false or fraudulent pretenses, representations, or promises, (2) the specific intent to defraud, and (3) the use of the United States mails to execute the scheme." *United States v. Kennedy*, 64 F.3d 1465, 1475 (10th Cir. 1995); 18 U.S.C. § 1341. The indictment charged that Mr. Haber's actions with respect to Equitable Life and his false statements to the Chafis and Ms. Corwin were part of one overall scheme to defraud and obtain money by false pretenses. Mr. Haber contends the misrepresentations on his disability insurance application and his actions with respect to Equitable Life were unrelated to his efforts to obtain money from the Visions International investors. He argues proof of a "common

scheme" to defraud the investors would require evidence that he planned in advance to suffer an injury and to use the resulting disability benefits to attract or reassure the investors. He claims there is no such evidence and therefore he should have been acquitted on the Equitable Life mail fraud counts.

We review *de novo* a district court's decision to deny a motion for judgment of acquittal, viewing the evidence in the light most favorable to the government. *United States v. Schluneger*, 184 F.3d 1154, 1158 (10th Cir. 1999), *cert. denied*, 120 S. Ct. 800 (2000). In the course of this review we determine "whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id*. (quotation omitted).

Based upon our review of the record, we conclude the government established that Mr. Haber's false representations to Equitable Life about his occupation and income were directly connected to his scheme to defraud the Visions International investors. Mr. Haber used the investors' money to misrepresent to Equitable Life that he owned a large window and door business in Israel from which he earned an annual income of $120,000. He could not have obtained the policy, or the disability benefits he received thereunder, had he not fraudulently obtained money from the Chafis and Ms. Corwin. Moreover, when Equitable Life began to investigate the disability claim after his injury, Mr. Haber used the money from the Chafis and Ms. Corwin, which he had deposited into his

personal savings and checking accounts, to create the false impression that his business provided him a significant and regular flow of income. There is also evidence that Mr. Haber promised Ms. Chafi he would pay back her Visions International investment from the proceeds of his disability insurance settlement. We conclude the district court did not err in denying Mr. Haber's motion for judgment of acquittal on the mail fraud counts related to Equitable Life.

## B. *Special Unanimity Jury Instructions*

We have held that 18 U.S.C. § 1341 identifies two interrelated but separate offenses: (1) engaging in a scheme or artifice to defraud, or (2) engaging in a scheme to obtain money or property by false or fraudulent pretenses. *United States v. Cronic*, 900 F.2d 1511, 1513 (10th Cir. 1990). [3] Mr. Haber contends his conviction should be overturned because each count in the indictment charged him with a scheme to defraud *and* a scheme to obtain money by false pretenses, while the jury instructions permitted conviction based upon *either* a scheme to defraud *or* a scheme to obtain money by false pretenses. [4] Mr. Haber contends the

---

[3] "[A] scheme to defraud focuses on the intended end result, not on whether a false representation was necessary to effect the result." *Cronic*, 900 F.2d at 1513. "A scheme to obtain money by false or fraudulent pretenses, representations, or promises, on the other hand, focuses on the *means* by which money was obtained." *Id*. at 1514.

[4] Although some counts of the indictment charged mail fraud under 18 U.S.C. §

(continued...)

jury's verdict is unreliable because it is impossible to know whether each juror voted to convict him of a scheme to defraud, or of false pretenses, or both.

"The Sixth Amendment guarantees a federal criminal defendant the right to a unanimous jury verdict." *United States. v. Linn*, 31 F.3d 987, 991 (10th Cir. 1994); *see also Richardson v. United States*, 526 U.S. 813, 817 (1999) ("[A] jury in a federal criminal case cannot convict unless it unanimously finds that the Government has proved each element."). Mr. Haber requested a jury instruction specifically explaining that the jury must unanimously agree as to whether there was a scheme to defraud *or* a scheme to obtain money by false pretenses. The district court refused this instruction because the jury instructions already included a general exhortation that the verdict must be unanimous in order to convict. *See United States v. Phillips*, 869 F.2d 1361, 1366-67 (10th Cir. 1988) (if jury given general unanimity instruction and no realistic possibility of confusion, court will assume jury understood specific findings underlying verdict must also be unanimous).

Mr. Haber's argument rests on an implicit contention that the indictment was duplicitous. "A duplicitous indictment charges the defendant with two or

---

[4](...continued)
1341 and others wire fraud under 18 U.S.C. § 1343, both statutes contain the same two-part language. Consequently, the separate offense analysis applies equally to both the mail fraud and the wire fraud statutes. *United States v. Trammell*, 133 F.3d 1343, 1354 n.2 (10th Cir. 1998).

-10-

more separate offenses in the same count." *United States v. Trammell*, 133 F.3d 1343, 1354 (10th Cir. 1998). However, Mr. Haber failed to object prior to trial to any error stemming from the duplicitous indictment. In this circuit, a defendant's failure to "timely challenge his indictment on duplicity grounds . . . waive[s] any later challenge based on a failure to use a special verdict form to avoid the alleged duplicity problem." *Id*.

In some circumstances, "a defendant can raise a late challenge to a duplicitous indictment if cause is shown that might justify the granting of relief from the waiver." *Id.* (quotation omitted). No such cause is shown in this case. "When a jury returns a guilty verdict on an indictment charging several acts in the conjunctive, . . . [a general] verdict stands if the evidence is sufficient with respect to any one of the acts charged." *Griffin v. United States*, 502 U.S. 46, 56-57 (1991) (quotation omitted). Here, the government went further and established both alternative offenses with respect to each count of mail and wire fraud; that is, it proved that Mr. Haber engaged in both a scheme to defraud and a scheme to obtain money by false pretenses, representations and promises. We note that Mr. Haber does not contend there was insufficient evidence to uphold either of the alternative theories. Even if the jury unanimity issues were properly before us, therefore, we would find any error harmless.

## C.    *Court Reporters Act*

Mr. Haber next contends the district court committed reversible error by failing to ensure that the court reporter transcribed three bench conferences.[5]  The Court Reporters Act requires that all proceedings in criminal cases held in open court be recorded verbatim by shorthand or mechanical or electrical means.  28 U.S.C. § 753(b).  This requirement applies to side-bar or bench conferences.  *E.g.*, *United States v. Winstead*, 74 F.3d 1313, 1321 (D.C. Cir. 1996); *Edwards v. United States*, 374 F.2d 24, 26 (10th Cir. 1966).  The requirements of the Court Reporters Act are mandatory, and no request for recordation is required. *Edwards*, 374 F.2d at 26 n.2.  Nevertheless, we have held that violation of this duty is not per se prejudicial error.  *Id.* at 26.  Rather, reversible error occurs when "the unavailability of a transcript makes it impossible for the appellate court to determine whether or not prejudicial error was committed" with regard to a challenged action.  *Id*.

Mr. Haber does not contend the transcript omissions make it impossible for this court to determine whether prejudicial error occurred, nor does he allege he

---

[5] Mr. Haber complained in his opening brief that the court reporter had also failed to transcribe the parties' objections to the jury instructions and the jury instruction conference.  Two months after the opening brief was filed, the court reporter located, with the government's assistance, a recording of the parties' objections and exceptions to the jury instructions.  That portion of the record was then transcribed and added to the record on appeal, and it is no longer at issue.

suffered any specific prejudice with respect to the omissions. Instead, he argues he is entitled to a new trial without a specific showing of prejudice because his appellate counsel did not represent him at trial, and thus was not present to know what happened during the bench conferences. He relies on *United States v. Selva*, 559 F.2d 1303 (5th Cir. 1977), which held that a defendant should be granted a new trial, even without a showing of specific prejudice, when defendant has new counsel on appeal and there are significant and substantial omissions from the trial transcript. *Id*. at 1306; *accord United States v. Preciado-Cordobas*, 981 F.2d 1206, 1212 (11th Cir. 1993) (following *Selva* precedent as binding because issued before Fifth Circuit split into Eleventh).

This approach has not been followed by any other circuit. All other circuits considering the issue have concluded that, whether or not appellate counsel is new, the defendant must show the transcript errors specifically prejudiced his ability to appeal. *United States v. Huggins*, 191 F.3d 532, 537 (4th Cir. 1999), *cert. denied*, 529 U.S. 1112 (2000); *United States v. Kelly*, 167 F.3d 436, 438 (8th Cir. 1999); *United States v. Brand*, 80 F.3d 560, 563 (1st Cir. 1996); *Winstead*, 74 F.3d at 1321-22; *United States v. Sierra*, 981 F.2d 123, 126 (3rd Cir. 1992); *United States v. Antoine*, 906 F.2d 1379, 1381 (9th Cir. 1990); *United States v. Gallo*, 763 F.2d 1504, 1530-31 (6th Cir. 1985). We agree with the majority of our sister circuits that some showing of prejudice is required before non-compliance

-13-

with the Court Reporters Act necessitates reversal of a defendant's conviction. In any event, we are bound by the precedent of this circuit, *United States v. Killion*, 7 F.3d 927, 930 (10th Cir. 1993), and *Edwards*, 374 F.2d at 26 (required prejudice despite a change in counsel on appeal).

Moreover, the facts of this case fail even to meet *Selva's* test. Courts following the *Selva* standard reverse "only upon a showing that there is a *substantial* and *significant* omission in the transcript." *United States v. Colmenares-Hernandez*, 659 F.2d 39, 43 (5th Cir. 1981) (emphasis added). Here, over the course of a nine-day trial involving dozens of witnesses, the court reporter failed to transcribe three relatively minor bench conferences, only two of which involved an evidentiary objection by Mr. Haber's defense counsel. Viewing the record as a whole, the untranscribed portions of the trial in this case do not constitute "significant and substantial" omissions from the trial transcripts. *See United States v. Stefan*, 784 F.2d 1093, 1102 (11th Cir. 1986) (absence of transcripts from one hour and forty-five minute bench conference not substantial and significant omission).

As noted, Mr. Haber has not articulated any prejudice suffered as a result of the omitted bench conferences. We have carefully reviewed the record and are satisfied that Mr. Haber suffered no prejudice because there is no "likelihood that reversible error occurred during [these] few untranscribed bench conferences."

-14-

*Winstead* , 74 F.3d at 1321.  We do not, of course, condone off-the-record bench conferences.  It is the duty of the district court to comply with the Court Reporters Act, and off-the-record side-bar or bench conferences are improper.  Nevertheless, the burden is upon Mr. Haber to demonstrate prejudice stemming from the failure to adhere to the requirements of section 753(b), and he has not done so.

### D.      *Abuse of Position of Trust Sentence Enhancement*

The district court imposed a sentence enhancement pursuant to U.S. Sentencing Guidelines Manual § 3B1.3 (1998) (USSG).  That guideline provides, in pertinent part:  "If the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase [the offense level] by 2 levels."  *Id*.  The Sentencing Commission has explained that "'[p]ublic or private trust' refers to a position of public or private trust characterized by professional or managerial discretion (      *i.e*., substantial discretionary judgment that is ordinarily given considerable deference)."        *Id*. cmt. n.1.

We review the district court's application of the Sentencing Guidelines *de novo* , but review its underlying findings of fact for clear error.        *United States v. Burridge* , 191 F.3d 1297, 1301 (10th Cir. 1999).  Whether a defendant occupied

a position of trust under USSG § 3B1.3 is generally a factual matter. *Id.* at 1305. In making this determination, the district court may consider a number of factors, including: "the extent to which the position provides the freedom to commit a difficult-to-detect wrong, and whether an abuse could be simply or readily noticed; defendant's duties as compared to those of other employees; defendant's level of specialized knowledge; defendant's level of authority in the position; and the level of public trust." *United States v. Williams*, 966 F.2d 555, 557 (10th Cir. 1992) (citations omitted).

Section 3B1.3 embraces conduct involving a fiduciary or personal trust relationship. However, courts "must carefully distinguish between those arms-length commercial relationships where trust is created by the defendant's personality or the victim's credulity, and relationships in which the victim's trust is based on defendant's position in the transaction." *United States v. Koehn*, 74 F.3d 199, 201 (10th Cir. 1996). "To invoke § 3B1.3, the defendant must either occupy a formal *position* of trust or must create sufficient indicia that he occupies such a position of trust that he should be held accountable as if he did occupy such a position." *United States v. Queen*, 4 F.3d 925, 929 n.3 (10th Cir. 1993). Mr. Haber contends there was merely a relationship of confidence in this case, not a fiduciary or personal trust relationship.

-16-

We are satisfied from our review of the evidence that Mr. Haber was in a fiduciary or personal trust relationship with the Chafis and Ms. Corwin. They entrusted him with supervision and management of their investment funds because he held himself out as the operating partner and manager of Visions International, responsible for all its Israeli operations. Mr. Haber acknowledged that he was the "key man" in the purported business, and that no one else had the connections he had with anyone in Israel or knew how to conduct the business. R. Vol. VII, at 1068-69. A defendant occupying a sham position of trust is subject to the section 3B1.3 enhancement. *See* USSG § 3B1.3, cmt. n.2 ("This adjustment also applies in a case in which the defendant provides sufficient indicia to the victim that the defendant legitimately holds a position of private or public trust when, in fact, the defendant does not."); *see also United States v. Lowder*, 5 F.3d 467, 473 (10th Cir. 1993) (upholding enhancement where defendant entrusted with, and able to spend, investor funds without oversight only because of his position as president of sham investment corporations).

As the managing partner of Visions International, Mr. Haber was responsible for opening a corporate bank account in Israel and for hiring an Israeli attorney and accountant. He therefore had great discretion to use the Chafis' and Ms. Corwin's investment money as he chose, without supervision or

accountability. He was to be responsible for all of the company's Israeli operations, making it very difficult for the investors to detect his fraud. Mr. Haber was the only one of the investors who spoke Hebrew and he claimed to have the crucial relationships with Israeli building developers, lawyers, bankers and government officials, and with the American window and door manufacturers. Thus, he also claimed to possess a significant degree of specialized knowledge. We conclude the district court did not err in increasing Mr. Haber's sentence under section 3B1.3.

Mr. Haber further contends the district court's factual findings are inadequate to support the section 3B1.3 enhancement. The district court stated that it found the presentence report's findings with respect to Mr. Haber's abuse of a position of trust to be correct, and this was sufficient. *United States v. Denetclaw*, 96 F.3d 454, 459 (10th Cir. 1996) (district court's adoption of presentence report satisfies its obligation to make findings regarding sentence enhancement).

*E.*      *Amount of Intended Loss*

Finally, Mr. Haber contends the district court erred in increasing his offense level by eleven levels based on its finding that he intended to inflict a loss in excess of $800,000 on Equitable Life. Under USSG § 2F1.1(b)(1), the offense level is calculated based in part on the dollar value of the loss involved in the criminal conduct. Mr. Haber points out that the actual loss to all of his victims was $333,910, which includes the $20,000 that Equitable Life paid him in four monthly installments prior to rescinding his disability policy. However, if the loss that a defendant intended to inflict can be determined and it exceeds the actual loss, the Sentencing Guidelines provide that the court should use the *intended* loss to calculate the defendant's offense level. *Id.*, cmt. n.8. "To meet the requirements of the Guideline, . . . the record must support by a preponderance of the evidence the conclusion that [the defendant] realistically intended a [particular] loss, or that a loss in that amount was probable." *United States v. Smith*, 951 F.2d 1164, 1168 (10th Cir. 1991). "[A]n intended loss under § 2F1.1 'cannot exceed the loss a defendant in fact could have occasioned if his or her fraud had been entirely successful,' regardless of whatever loss the defendant subjectively believed he or she could impose on the fraud victim." *United States v. Galbraith*, 20 F.3d 1054, 1059 (10th Cir. 1994) (quoting *United States v. Santiago*, 977 F.2d 517, 524 (10th Cir. 1992)).

The district court based its finding of intended loss on the fact that, under the terms of the policy, Mr. Haber was entitled to $5,000 a month until he was sixty-five, and on the evidence at trial that Mr. Haber intended to claim that amount of benefits from Equitable Life. The district court concluded that settlement negotiations between Mr. Haber and the insurer, which occurred after Equitable Life rescinded its policy, were not relevant.

Mr. Haber contends the evidence does not support a finding that he reasonably intended Equitable Life to lose $800,000. He relies on the fact that during the settlement negotiations, Equitable Life's highest settlement offer to him was only $140,000. Citing *Santiago*, 977 F.2d 517, Mr. Haber argues that his intended loss could not have been greater than that amount, regardless of his subjective belief as to his policy's value.

*Santiago* is easily distinguished. There, the defendant falsely reported to his insurance company that his car, which had a "blue book" value of $4,800, had been stolen, and he submitted a claim for $11,000. *Id.* at 519. We held that the intended loss was $4,800 despite the insured's higher claim because the "insurance company would not have paid more than the car's $4,800 blue book value in any circumstances." *Id*. at 526. In contrast, Mr. Haber was entitled under the terms of his disability policy to receive monthly benefits of $5,000 during his working lifetime. He filed a counterclaim against Equitable Life

demanding this amount and testified at trial that Equitable Life owed him $5,000 a month until he was sixty-five. He was thirty-seven at the time he filed his disability claim, and the monthly payments he sought from Equitable Life would have totaled approximately $1,620,000, far in excess of the court's finding of $800,000. The loss that Mr. Haber intended Equitable Life to suffer was economically feasible because, unlike the defendant in *Santiago*, he was capable of inflicting that loss and had some reasonable prospect of success. Had Equitable Life not investigated Mr. Haber's claim and discovered his fraud, it would have continued to pay him $5,000 a month throughout his working life. The district court did not err in holding that $800,000 was part of Mr. Haber's scheme to defraud Equitable Life and was an "intended loss" under section 2F1.1.

We **AFFIRM** defendant's conviction and sentence on all counts.