[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
DECEMBER 22, 2009
THOMAS K. KAHN
CLERK

No. 08-16356

D. C. Docket No. 07-00202-CR-7-LSC-HGD

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

WILLIAM LUTHER LANGSTON,

Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of Alabama

(December 22, 2009)

Before DUBINA, Chief Judge, BIRCH and SILER,[*] Circuit Judges.

_____

[*]Honorable Eugene E. Siler, Jr., United States Circuit Judge for the Sixth Circuit, sitting by designation.

DUBINA, Chief Judge:

Once again, our circuit is presented with an appeal involving an Alabama official and his part in a massive case of public corruption. The facts of this case should be an affront to every decent law-abiding citizen in the State of Alabama. A federal jury found William Luther Langston, former Executive Director of the Alabama Fire College, guilty on 36 counts of mail fraud, wire fraud, theft of federal funds, conspiracy, money laundering, and conduct giving rise to criminal forfeiture. Following the convictions, the district court sentenced Langston to 125 months' imprisonment plus three years of supervised release and ordered him to pay $1,428,945.40 in restitution. On appeal, Langston challenges his convictions and final sentence.

After a thorough review of the record, we are compelled to vacate his convictions on Counts 5–12, 21–22, 25–27, 30–32, and 36. On these counts, the Government erroneously indicted Langston as an agent of the State of Alabama under 18 U.S.C. § 666, instead of an agent of the Alabama Fire College. The record demonstrates that the Government failed to produce sufficient evidence to prove that Langston was a state agent as it pertained to these specified counts. However, we conclude sufficient evidence exists in the record to support the remaining counts of conviction, including the § 666 counts in the indictment that

2

charged Langston as an agent of the Alabama Poison Control Center, (Counts 13–19), and charged him as an agent of both the state and the Alabama Poison Control Center, (Counts 33–34).

## I.  FACTS

*The Agencies*

Prior to 1955, the Alabama Department of Education coordinated fire fighter training in Alabama.  In that year, the Alabama Legislature created the Alabama Fire College ("Fire College"), which the Alabama Board of Education later affiliated with Shelton State Community College in Tuscaloosa.  In 1988, the Legislature merged the Fire College with another agency known as the Alabama Fire Fighters Personnel Standards and Education Commission ("Fire College Commission").  *See* Ala. Code § 36-32-2 (2001).  The Fire College Commission is comprised of the State Fire Marshal, four gubernatorial appointees, and two representatives of fire fighters' associations.  *Id.*  The mission of both the Fire College and the Fire College Commission is to provide training and certification for the state's fire fighters and emergency medical technicians located within the state.  The Fire College is authorized to hire an Executive Director, and the Alabama Fire Fighters' Personnel Standards and Education Fund within the State Treasury provides the funding for both agencies.  *Id.* § 36-32-9.  The Executive

3

Director works at the sole discretion of the Fire College Commission. *Id.* § 36-32-3 ("The commission may employ an executive director who shall serve at the discretion of the commission.").

Langston served as Executive Director of the Fire College from 1988 to 2006, and during that same period, served as Chairman of the Fire College Foundation, a non-profit entity formed by Langston and others to support the Fire College by providing scholarship support for emergency medical service students. Langston's employment contracts were with the Fire College Commission, and his paychecks and W-2s came from the Fire College Commission. Langston was paid according to a State Board of Education salary schedule, and he received State employment benefits, such as insurance, leave, and retirement. As Executive Director, Langston was responsible for all operations of the Fire College: he hired, terminated, and reassigned Fire College employees, managed and directed the funds of the Fire College, and entered into contracts on behalf of the Fire College.

The Alabama Poison Control Center ("Poison Center"), a non-profit center that provides educational information regarding poisonings in Alabama, operates as a division of the Fire College. The Poison Center received more than $100,000 of federal funds from the United States Department of Health and Human Services each year from 2001 through 2006. Dr. John Fisher, Director of the Poison

Center, testified that he and his employees are state employees, but his employment contract was with the Fire College and the Fire College Commission. Dr. Fisher reported directly to Langston, his "boss." [R. Vol. II, Doc. 115, p. 249, 254.] Dr. Fisher stated that Langston indicated to him that the Poison Center should make regular contributions to the Fire College Foundation to compensate for shortfalls in the budget. Dr. Fisher testified that the Poison Center paid $50,000 to the Fire College and $30,000 to the Fire College Foundation each year through periodic payments. In total, the Poison Center gave over $500,000 to the Fire College and the Fire College Foundation, at the direction of Langston. [*Id.* at 243–59.] Dr. Fisher also testified that Langston asked him to write a consultation agreement between Dr. Fisher and Robert Nix, Deputy Director of the Fire College, to pay Nix $20,000 for work for the Poison Center. Nix did no substantive work for the Poison Center. [*Id.* at 260.]

*Langston diverted Fire College funds to himself, family, and friends*

In 2001 and 2002, Langston gave $3,000 raises to five part-time Fire College employees in return for their $1,000 contribution to the "coffee fund," which was Langston's personal fund. [R. Vol. IV, Doc. 117, p. 12–79.] Unlike the employee's political contributions through their local fire departments, with these contributions, there were no consent forms, payroll deductions, or reports.

5

In 2002, the Shelton State Community College Foundation ("Shelton State Foundation") decided to build a house for Shelton State Community College President, Rick Rogers, in the Woodbank subdivision near the college. The builder's cost estimate for the house — $504,000 — was higher than the amount that Shelton State Foundation agreed to spend, so Rogers and Langston agreed that Shelton State Community College and the Fire College would contribute the difference out of their respective budgets. Langston then spent about $99,000 of Fire College funds to pay contractors building the Woodbank house. To conceal this misuse of funds, Langston ordered all requisitions and purchase orders relating to the Woodbank house to be sent directly to him, bypassing the usual channels. Langston also directed James Levert, the Fire College's maintenance manager, to arrange with a sub-contractor, Dennis Sudduth Services, Inc. (a Fire College contractor), to accept payments from the Fire College and transfer those payments to another construction company (not a Fire College contractor) who was working on the house. [R. Vol. IV, Doc. 117, p. 79–134.] Langston and Rogers also arranged for Fire College and Shelton State Community College employees to work on the Woodbank house during business hours. [*Id.* at 134–177.]

*Langston and Roy Johnson arranged bogus jobs for their family members*

6

Roy Johnson, former Chancellor of Post-Secondary Education and former state legislator, testified that he and Langston "agreed to look after each other's children." [R. Vol. V., Doc. 118, p. 13.] Under this agreement, Langston offered Johnson's daughter employment as a curriculum specialist at the Fire College, for which little or no work was expected. [*Id.* at 22.] In return, Johnson gave Langston's daughter-in-law, Kelly, a job at Southern Union Community College and later at Wallace Community College. She did no meaningful work, but the State paid her $18,000 from 1998 through 1999. After this contract expired, Langston asked Johnson to find Kelly another job, which he did, and she received another $18,000 for bogus employment. In addition, Johnson arranged for Gadsden State Community College to award Langston's son, Bo, consulting contracts valued at $66,000.

*Langston diverted funds to Robert Nix*

In 1996, Robert Nix retired from his full-time position at the Fire College and began receiving limited state retirement benefits. Langston lobbied Johnson to find a job for Nix in the two-year college system that did not require any work. Johnson referred Nix to Winston Hayes, owner of the Access Group, a computer software company that conducted business with the Department of Post-Secondary Education and the Fire College. Langston executed a contract obligating the Fire

College to pay Access Group $3,000 per month for computer consultation. [R. Vol. III, Doc. 116, p. 138–42.] Access Group executed a consulting agreement with Nix to pay him $2,500 per month for computer consultation to support Access Group in its bogus work for the Fire College. Nix did no work for Access Group, and Access Group did no work for the Fire College. [*Id.* at 142–44.] Through this scheme, Langston diverted $92,500 of Fire College funds to Nix.

Langston also diverted funds from the Poison Center to Nix by directing Dr. Fisher to put Nix on his payroll as a consultant. Nix testified that he did no work for the Poison Center, [R. Vol. I, Doc. 114, p. 104.], but Dr. Fisher recalled that Nix once repaired a leaky toilet. [R. Vol. II, Doc. 115, p. 260–61.] From 1998 to 2004, Langston directed the diversion of $126,500 of Poison Center funds to Nix.

*Langston diverted funds to the Fire College Foundation*

The Alabama Board of Education Trust Fund, via the Fire College Commission, provided annual appropriation of funds to the Fire College, which included funds to cover all the salaries of the Poison Center employees. Langston created an artificial budget shortfall for Poison Center salaries and told Dr. Fisher that the Fire College would cover that shortfall out of its remaining funds. Langston told Dr. Fisher that the Poison Center would have to reimburse those additional expenditures by diverting $512,000 from the Poison Center to the Fire

8

College Foundation, not the Fire College.  Dr. Fisher testified that Langston indicated to him that the Poison Center "should make regular contributions to the foundation." [R. Vol. II, Doc. 115, p. 242.]  Even after the authorities began their investigation and the FBI raided the Fire College, Langston told Dr. Fisher to keep making Poison Center payments because if he stopped, it would look "suspicious." [*Id.* at 257.]

In 2002, Langston asked then-Governor Don Siegelman for emergency financial assistance for the Fire College.  Johnson approved that request on behalf of the Alabama Department of Post-Secondary Education and submitted a voucher to the state Comptroller requesting $300,000 for the Fire College Foundation, not the Fire College.  Although Langston acknowledged that the check should have been made out to the Fire College, he told Nix, the Fire College Foundation's treasurer, to deposit it into the Fire College Foundation's account. [R. Vol. I, Doc. 114, at 85.]

Langston also contacted state legislator Bryant Melton to apply for a community service grant out of the Alabama Education Trust Fund to provide funds for the Fire College Foundation.  Because Melton was having financial problems due to a gambling habit, he agreed to provide funds to the Fire College Foundation in exchange for Langston's help with Melton's daughter's medical

school expenses. Melton submitted three fraudulent applications for community service grants for the Fire College Foundation, stating that such grants would be used to buy computer software for Fire College students and to provide scholarships for volunteer fire fighters. The total amount of the bogus applications was $85,000. In return, Langston directed the Fire College Foundation to grant amorphous scholarships to Melton's daughter. Langston delivered the checks to Melton, who cashed the checks for his own benefit. The total amount of the money diverted to Melton was $68,000, which left a net benefit of $17,000 to the Fire College Foundation.

*Langston diverted funds through the Fire College to private individuals*

In January 2004, Langston encouraged the Fire College Foundation to build or buy a house for him. Charles Hardin, an attorney and Fire College Foundation board member, testified that buying a house would be a good investment for the Fire College Foundation. [R. VI, Doc. 119, p. 169.] The Board unanimously approved the purchase of a house. Langston selected the location, near his daughter, grandchildren, and elderly mother-in-law, and his wife selected the furnishings. At Langston's direction, the Fire College Foundation spent more than $335,000 to buy the house and another $4,800 on a mattress and box springs, bed linens, and draperies to furnish the house.

Langston also approved the Fire College Foundation expenditures to benefit his son and grandsons. The Fire College Foundation spent over $4,000 for appliances for his son's home, and it paid a total of $7,800 for his grandsons' tuition at private schools. Langston also approved the disbursement of $7,500, in the guise of a "scholarship" to Gail Phillips, his secretary, as a gift for her retirement. Nix testified that Langston told him to use the Fire College Foundation money to purchase two motorcycles for their benefit and a trailer for the motorcycles. [R. Vol. I, Doc. 114, p. 25–95.]

*Procedural History*

The Government filed a superseding indictment charging Langston with 26 counts of violating 18 U.S.C. § 666(a)(1)(A), theft of federal funds. Seventeen of these counts charged Langston as an agent of the State of Alabama (Counts 5–12, 21–22, 25–27, 30–32, 36), seven counts charged him as an agent of the Poison Center (Counts 13–19), and two counts charged him as an agent of both entities (Counts 33–34). The Government also charged Langston with violations of the federal mail and wire fraud statutes (Counts 1–3, 28), conspiracy under 18 U.S.C. § 371 (Counts 4, 20, 24, 29), money laundering conspiracy under 18 U.S.C. § 1956(h) (Counts 23, 35), conduct giving rise to criminal forfeiture under 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) (Count 37), and conduct giving rise to

11

criminal forfeiture under 18 U.S.C. § 982(a)(1) (Count 38). Following trial, the jury found Langston guilty on all counts. The district court sentenced Langston to 125 months' imprisonment plus three years supervised release. Langston then perfected this appeal.

## II. ISSUES

1. Whether there is sufficient evidence to support the jury's finding that Langston was an agent of the State of Alabama or an agent of the Poison Center for conviction under 18 U.S.C. § 666.

2. Whether the district court abused its discretion in declining to give Langston's proposed jury instruction on good faith reliance on the advice of counsel.

3. Whether Langston's sentence is substantively unreasonable.

## III. DISCUSSION

*A. Sufficiency of the evidence*

1. Agent of the State

Langston contends that the § 666 convictions against him charging him as an agent of the State of Alabama cannot stand because the Government failed to produce sufficient evidence that he was an agent of the state. The Government counters that it produced adequate evidence of Langston's employment with the

12

state and his role as Executive Director of the Fire College, from which the jury reasonably concluded that Langston was an agent of the state as charged in the indictment. We review *de novo* a challenge to the sufficiency of the evidence, considering the evidence "in the light most favorable to the government and resolv[ing] all reasonable inferences and credibility evaluations in favor of the jury's verdict." *United States v. Robertson*, 493 F.3d 1322, 1329 (11th Cir. 2007) (internal quotation marks omitted).

First, we must decide the relevance of a defendant's employment with a state agency as evidence of the defendant's agency of the state. The Government charged Langston as an agent of the state, but the bulk of the evidence that it presented at trial related to his role as Executive Director of the Fire College. Langston argues that the statute, written in the disjunctive, requires the conviction to relate to his agency relationship with a single entity. *See* 18 U.S.C. § 666(a)(1) (criminalizing specific theft or bribery committed by "an agent of an organization, *or* of a State, local, or Indian tribal government, *or* any agency thereof") (emphasis added). The Government contends that the evidence showed Langston to be both an agent of the State and of the Fire College.

Nothing in the text of the statute prohibits the Government from charging a defendant as an agent of the state and as an agent of a state agency. *See United*

13

*States v. Pretty*, 98 F.3d 1213, 1219 (10th Cir. 1996) (noting that defendant was simultaneously an agent of the state and an agent of the state treasury). In fact, numerous courts have recognized the dual agent status of a defendant under a § 666 charge. *See, e.g.*, *Pretty*, 98 F.3d at 1219; *United States v. Moeller*, 987 F.2d 1134, 1138 (5th Cir. 1993) (defendants were agents of two state agencies–one that controlled the other for which they actually worked); *United States v. Madrzyk*, 970 F. Supp. 642, 643–44 (N.D. Ill. 1997) (municipal code made city Alderman an agent of both the city and the city council).

These cases reach the common-sense conclusion that an employee of an agency entity cannot be an agent of the principal entity unless the legal construct establishes such a relationship. For example, in *Moeller*, the Fifth Circuit concluded that the defendants were agents of the Texas Department of Agriculture ("TDA") by virtue of their employment at the Texas Federal Inspection Service ("TFIS") because the TFIS was an arm of the TDA empowered to enforce its regulations. 987 F.2d at 1138. The court inspected the cooperative agreement that created the TFIS in reaching its conclusion that employees of the agency, TFIS, were agents of the principal entity, TDA, because their conduct was directly executed on behalf of the TDA. *See id.* Similarly in *Madrzyk*, the court held that a city Alderman was an agent of both the city and the city council because the

14

municipal code said exactly that. 970 F. Supp. at 643–44; *see also Pretty*, 98 F.3d at 1219 (state law put deputy treasurer in charge of investing state funds, authorizing her to act on behalf of both the state and its treasury).

These results are mandated by the language of the statute, which defines "agent" as one who is "authorized to act on behalf of another person or a government." 18 U.S.C. § 666(d)(1). We must necessarily scrutinize that which purports to create the employment relationship with the agency to determine if the employee is authorized to act on the principal entity's behalf. *See United States v. Sotomayor-Vazquez*, 249 F.3d 1, 7–9 (1st Cir. 2001) (evidence showed that a "consultant" actually acted in a managerial capacity of organization); *United States v. Phillips*, 219 F.3d 404, 412–13 (5th Cir. 2000) (closely examining state law to hold that a local tax assessor is not an agent of the parish).

Our task then is to determine whether the applicable law creating the Executive Director's employment with the Fire College also made the Executive Director an agent of the state. Based upon our examination of the relevant state law, we conclude that it does not. Alabama Code § 36-32-3 states that the Executive Director serves "at the discretion of" the Fire College Commission. Additionally, the Fire College Commission is empowered to set the Executive Director's salary. Rather than indicating that the Executive Director is somehow

15

empowered to act on behalf of the state, the state statute makes clear that the Executive Director serves at the pleasure of the Fire College Commission. Unlike a local ordinance or cooperative agreement that expressly creates a dual agency relationship, Ala. Code § 36-32-3 establishes the Executive Director's agency with just one entity—the Fire College. Because Langston's employment with the Fire College does not authorize him to act on behalf of the state under the applicable state law, evidence of his employment with the Fire College is not relevant to the charges asserting that he acted as an agent of the state.

Next, we must determine whether the Government produced sufficient relevant evidence at trial to allow a jury to conclude that Langston was an agent of the state. We conclude that it did not. The Government did offer some evidence of Langston's agency relationship with the state independent of his employment with the Fire College. The Government asserts that Langston's salary was paid from state funds and determined by a state salary schedule, and that he received state employment benefits. It asserts that his power over state funds at the Fire College demonstrates that he was authorized to act as an agent on the state's behalf.

Contrary to the Government's contentions, the evidence it produced failed to show that Langston was an agent of the state. The Fire College Commission set

Langston's salary, Ala. Code § 36-32-3, subject to state schedules. Langston's W-2 forms listed the Fire College Commission as his employer, and his employment contract was with the Fire College Commission. In Alabama, most state agency employees receive state employment benefits, though they are not agents of the state itself. *See, e.g.,* Ala. Code § 16-25-1 – 140. The money that Langston controlled was that of the Fire College, not of the state. Simply because it passed through the state treasury to the state Education Trust Fund does not make it state funds sufficient to demonstrate that Langston was an agent of the state.

Most of the evidence that the Government presented showed Langston's agency relationship with the Fire College. The remaining evidence was not significant enough to allow a reasonable jury to conclude that Langston was an agent of the state, independent of his relationship with the Fire College. Because the Government chose to charge Langston as an agent of the state, instead of as an agent of the Fire College and failed to produce sufficient evidence showing that agency relationship, we vacate the convictions on those counts.

2. Agent of the Poison Center

Langston also argues that the Government did not present sufficient evidence to demonstrate that he was an agent of the Poison Center, or that he was an agent of both the Poison Center and the state. The record belies this argument.

17

There was sufficient evidence from which a reasonable jury could have concluded that he was an agent of either entity. *See Pretty*, 98 F.3d at 1219 (stating that Government can charge a defendant as an agent of the state and as an agent of a state agency). Dr. Fisher, Poison Center Director, testified that his employment contract was with the Fire College and the Fire College Commission, and that Langston signed his employment contract. The employment contract stated that Dr. Fisher worked at the will of the Fire College and the Fire College Commission. Dr. Fisher considered Langston his "boss," and he thought that Langston had the authority to tell him how to write the Poison Center checks. He acknowledged that the federal grant money and the state grant money were together in the Poison Center bank account. Dr. Fisher stated that part of the money that the Poison Center paid to the Fire College Foundation came from federal funds that the Poison Center received from the United States Department of Health and Human Services. [R. Vol. II, Doc. 115, p. 218–Vol. III, Doc. 116 p. 44.]

Based upon this evidence, plus the evidence that Langston directed Dr. Fisher to put Nix on the Poison Center payroll as a consultant, although Nix performed no consulting work for the Poison Center, a reasonable jury could find, and did so find, that Langston was an agent of the Poison Center under 18 U.S.C.

18

§ 666, as charged in the indictment. Because the evidence is sufficient to establish this element of the § 666 charge, and the Government charged Langston as both an agent of the Poison Center and the state, we affirm the convictions on Counts 13–19, and 33–34.

B. *Good-faith reliance on the advice of counsel as a defense*

Langston argues that his convictions on Counts 1–3 should be reversed because the district court failed to instruct the jury that his good faith reliance on the advice of counsel was a defense to the charges involving the Fire College Foundation's purchase and furnishing of a home that Langston intended to use for his personal residence. We review a district court's ruling on a proposed jury instruction for abuse of discretion. *United States v. Condon*, 132 F.3d 653, 656 (11th Cir. 1998).

"The defense of good faith reliance on expert advice is designed to refute the government's proof that the defendant intended to commit the offense." *United States v. Johnson*, 730 F.2d 683, 686 (11th Cir. 1984) (internal quotation marks omitted). We have explained that a defendant is not entitled to a good faith reliance instruction unless the record shows that "(1) he fully disclosed all material facts to his attorney; and (2) he relied in good faith on advice given by his attorney." *Condon*, 132 F.3d at 656. After considering the testimony and

19

argument from Langston, the district court concluded that Langston did not fully disclose to attorney Charles Hardin all the material facts relating to the Millbrook house and that Langston did not rely on any legal opinion from Hardin before buying and furnishing the house.

Based on our review of the record, we conclude that the district court did not abuse its discretion in declining to give Langston's proposed jury instruction on good faith reliance. First, Langston did not disclose to Hardin any material facts relating to the purchase of the house. When Hardin cast his vote as a board member of the Fire College Foundation, he was not aware that Langston intended to use the house as his personal residence nor was he aware that Langston was spending the Fire College Foundation funds for purposes other than the stated purposes of the Fire College Foundation. Hardin cast his vote believing that the property purchase was a good investment for the Fire College Foundation. Second, there was no evidence suggesting that Langston actually relied on any legal opinion regarding the purchase of the Millbrook house. Langston had the original idea to purchase a house and presented the idea to the Fire College Foundation Board. Langston posed no questions to Hardin about the house purchase until after the purchase was complete. In sum, the record shows only that Hardin cast his vote during a board meeting as a board member, not

necessarily as the board's legal counsel, and that he cast his vote without full knowledge of the material facts relating to the house purchase. Accordingly, there was no abuse of discretion.[1]

C. *Langston's Sentence*

Langston challenges the substantive reasonableness of his sentence, arguing that it was greater than necessary to achieve the objectives of sentencing because of his age and poor health. We review a district court's imposition of a sentence for reasonableness. *United States v. Booker*, 543 U.S. 220, 264, 125 S. Ct. 738, 767 (2005). First, we must ensure that the district court committed no significant procedural error, such as "failing to consider the [18 U.S.C.] § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence." *Gall v. United States*, 552 U.S. 38, 51, 128 S. Ct. 586, 597 (2007). After we determine that the district court's sentencing decision is procedurally sound, we then review the substantive reasonableness of the sentence for abuse of discretion. *Id.* Our reasonableness review is deferential, requiring the court to determine "whether the sentence imposed by the district court fails to achieve the purposes of sentencing as stated in section 3553(a)."

---

[1] Furthermore, the district court instructed the jury that they must acquit Langston if there was reasonable doubt as to whether he acted with an intent to defraud or in good faith based on an honestly held belief or opinion. [R. Vol. VII, Doc. 120.]

21

*United States v. Talley*, 431 F.3d 784, 788 (11th Cir. 2005).  The burden is on the party challenging the sentence to show that the sentence was unreasonable in light of the record and the § 3553(a) factors.  *Id.*

Pursuant to § 3553(a), the sentencing court shall impose a sentence sufficient, but not greater than necessary, to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, deter criminal conduct, protect the public from future crimes of the defendant, and provide the defendant with needed educational or vocational training.  18 U.S.C. § 3553(a)(2).  The sentencing court should also consider the following factors in determining a particular sentence: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the kinds of sentences available; (3) the guideline range and the pertinent policy statements of the Sentencing Commission; (4) the need to avoid unwarranted sentencing disparities, and (5) the need to provide restitution to victims.  *Id.* at (a)(1), (a)(3)–(7).  "The weight to be accorded any given § 3553(a) factor is a matter committed to the sound discretion of the district court, and we will not substitute our judgment in weighing the relevant factors."  *United States v. Amedeo*, 487 F.3d 823, 832 (11th Cir. 2007) (alterations and internal quotation marks omitted).

Langston does not assert that the district court committed any procedural error in his sentencing. Rather, he contends that the district court's imposition of his sentence was substantively unreasonable. Specifically, he argues that, given his age and health, his sentence was greater than necessary to achieve the purposes of § 3553(a). However, the district court did consider these two factors and gave Langston a downward variance, stating that his sentence would have been significantly longer but for those factors. Essentially, Langston is asking this court to reweigh these relevant factors. We do not reweigh relevant factors nor do we remand for re-sentencing unless the district court committed a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence outside the range of reasonable sentences. *Amedeo*, 487 F.3d at 832. The district court did not err in weighing the relevant factors, nor is Langston's sentence outside the reasonable range of sentences. The district court sentenced Langston to 125 months' imprisonment, 43 months below the low-end guideline range. Langston fails to show why his age and health justify a downward variance greater than 43 months, or how his below-range sentence is unreasonable in light of the record and the § 3553(a) factors.

We also find unavailing Langston's argument that his sentence creates an unwarranted sentencing disparity. Langston compares his sentence to the sentence

of Robert Nix, who pled guilty to three counts. However, there is no comparison. Unlike Langston, Nix cooperated with the Government's investigation. Moreover, the evidence showed that Langston was the leader and organizer of the public corruption schemes. We have stated that there is no unwarranted disparity when a cooperating defendant pleads guilty and receives a lesser sentence than a defendant who proceeds to trial. *United States v. Docampo*, 573 F.3d 1091, 1101 (11th Cir. 2009); *United States v. Williams*, 526 F.3d 1312, 1323–24 (11th Cir. 2008). Therefore, any sentencing disparity was not unwarranted. Accordingly, we conclude that Langston's sentence was substantively reasonable; nevertheless, we must vacate his sentence due to the fact that we are compelled to vacate some of the § 666 convictions, as previously discussed in this opinion.[2]

## IV. CONCLUSION

Because the Government erroneously indicted Langston as an agent of the state and failed to produce sufficient evidence at trial to support such an agency relationship, we vacate the § 666 convictions on Counts 5–12, 21–22, 25–27, 30–32, and 36 and remand to the district court for further proceedings. We affirm the remaining counts of conviction. We also find no abuse of discretion in the

---

[2] Although we vacate some of the counts of conviction and remand for re-sentencing by the district court, we are aware that our ruling will likely not affect Langston's term of imprisonment. The only portion of Langston's sentence that will be affected upon remand is the restitution amount.

district court's failure to give Langston's proposed jury charge on good faith reliance, and we conclude that Langston's sentence was substantively reasonable. Accordingly, we affirm in part, vacate in part and remand for further proceedings consistent with this opinion.

AFFIRMED in part, VACATED in part, and REMANDED.