[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-13258
Non-Argument Calendar
_____

D.C. Docket No. 2:13-cr-00004-LGW-JEG-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

CLEVELAND J. ENMON,
M.D.,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Southern District of Georgia
_____

(April 27, 2017)

Before JORDAN, JULIE CARNES, and JILL PRYOR, Circuit Judges.

PER CURIAM:

Dr. Cleveland Enmon was charged with 92 federal crimes arising from his nine-month participation in two Georgia pain management clinics that purportedly operated as "pill mills."  Dr. Enmon appeals his convictions and 240-month sentence for conspiracy to unlawfully dispense controlled substances in violation of 21 U.S.C. §§ 841(b)(1)(C) and 846, unlawful dispensation of controlled substances in violation of §§ 841(a)(1), (b)(1)(C), (b)(1)(E), and (b)(2), and money laundering in violation of 18 U.S.C. §§ 1957(a) and (b)(1).

Dr. Enmon raises four arguments on appeal.  First, he asserts that the district court plainly erred (a) by instructing the jury that his good faith belief that he was acting in the usual course of professional practice was irrelevant and (b) by giving the jury a general verdict form.  Second, he challenges the district court's decision to allow him to represent himself at trial and at sentencing.  Third, he claims that the government presented insufficient evidence regarding the standard of medical care in Georgia.  Finally, he argues that his 240-month sentence was substantively unreasonable.  After careful review of the record and the parties' briefs, we affirm.

## I

Because we write for the parties, we assume their familiarity with the underlying record and recite only what is necessary to resolve this appeal.

In May of 2011, Dr. Enmon was hired to work for a pain management clinic called Brunswick Wellness operated by his then-supervisor, Ronald Colandrea.

Brunswick Wellness was a cash-only facility with little to no medical equipment, and employed doctors who were primarily responsible for issuing prescriptions. During Dr. Enmon's short employment at Brunswick Wellness, the clinic was the subject of an ongoing investigation following a local pharmacist's complaints about the clinic's practices.[1]

Undeterred by the Drug Enforcement Agency's raid of Brunswick Wellness in July of 2011, Dr. Enmon opened a new clinic called Ocean Care in another part of Georgia just weeks later.  Dr. Enmon was the only doctor at Ocean Care and he personally issued handwritten prescriptions, charging customers $275 per visit. Local pharmacists subsequently reported that Ocean Care was issuing an inordinate amount of prescriptions and surrounding businesses complained about large lines and loitering outside the clinic.  In October of 2011, the DEA raided Ocean Care and seized certain files and money orders.  But Dr. Enmon remained open for business through December of 2011.

Dr. Enmon was then arrested and charged with 92 federal counts of unlawfully dispensing controlled substances, conspiracy, and money laundering stemming from his employment at Brunswick Wellness and his operation of Ocean Care.  Concerned with his erratic behavior at a preliminary bond hearing, a

---

[1] Customer records from Brunswick Wellness revealed that, in a 51-day period, Dr. Enmon saw 1,098 patients on 2,166 visits and wrote approximately 7,883 prescriptions for over 600,000 medications including Roxicodone (a brand of the generic drug oxycodone) and Xanax.

3

magistrate judge ordered a mental evaluation of Dr. Enmon to determine whether he was competent to stand trial.    A forensic psychologist concluded that Dr. Enmon was competent to stand trial despite his "grandiose sense of self-importance" and that his uncooperative behavior was not based on delusion or mental illness, but rather an attempt to avoid the legal process.

After the mental evaluation, Dr. Enmon expressed his desire to waive counsel and proceed *pro se*.    During a preliminary *Faretta*[2] hearing before a magistrate judge, Dr. Enmon's attorney led the questioning about his age, education, and familiarity with the legal process, and the judge warned Dr. Enmon about the dangers of self-representation.    Following the hearing, the magistrate judge granted Dr. Enmon's request, and Dr. Enmon signed a written waiver acknowledging that he "knowingly, intelligently, and voluntarily" elected to waive counsel, and that standby counsel had been appointed.

At a pretrial hearing before the district court two months later, Dr. Enmon was similarly asked about his intention to waive counsel and reminded of the intricacies and dangers of self-representation in a federal criminal trial.    The district court conducted a second *Faretta* hearing to ensure that Dr. Enmon's decision was knowing and voluntary.    In pertinent part, the district court expressed

---

[2] *Faretta v. California*, 422 U.S. 806 (1975).

4

its concern as to whether Dr. Enmon understood the risks of self-representation by giving the following warning:

> Although the Magistrate Judge has covered this with you, I feel that it is my obligation to cover it with you as well, and that is to make sure you know that a trial of a federal criminal case here in this court is a complex matter in which training and experience come to bear, in particular, the training and experience that a trained and experienced trial attorney would have.  Although you have the right to proceed *pro se*, it is, nevertheless, my obligation to hold you to the Rules of Criminal Procedure and the Rules of Evidence as they apply in federal court.  I must tell you that even extremely intelligent people, like yourself, find themselves hamstrung, to some extent, if they are not extremely familiar with the Rules . . . because even if you do not know them, I still must apply them.  In fact, as a *pro se* litigant, you are entitled to no greater leeway or no special treatment.

Tr. of Pretrial Conference, D.E. 123, at 7–8.

The district court asked Dr. Enmon if he understood and he replied that he did.  *See id.*  The district court went on to describe court and trial procedures in detail, including that Dr. Enmon could lose his opportunity to proceed *pro se* for disrupting the trial or disregarding the rules of the court.  After indicating that standby counsel would be available at all times, the district court went over jury selection and the procedure for opening statements, witness presentation, Dr. Enmon's right to testify, and final arguments.

In response, Dr. Enmon maintained that he was highly educated, intelligent, and had experience representing himself in a previous criminal matter and in an administrative hearing with the DEA.  Moreover, Dr. Enmon stated for a second

5

time that he understood the severity of the charges against him and the possible penalties. The district court then granted Dr. Enmon's request to waive counsel.

At trial, 28 witnesses testified about Brunswick Wellness, Ocean Care, and Dr. Enmon's medical practices at both clinics. The previous owner of Brunswick Wellness, Mr. Colandrea, and the clinic's former manager testified for the government and admitted that they intended to run a "pill mill" from the start. Other lay witnesses included the clinic's former employees, Dr. Enmon's patients, doctors who also treated Dr. Enmon's patients, and investigating agents. These witnesses discussed the nature of the clinics and indicated that most (if not all) of the prescriptions Dr. Enmon issued followed inadequate medical examinations.

The district court instructed the jury as to the elements of the crimes charged against Dr. Enmon. In relevant part, the court instructed the jury that Dr. Enmon's good faith belief was irrelevant to the *mens rea* element for the unlawful dispensation of controlled substances charge because the jury had to determine from an objective standpoint whether Dr. Enmon issued prescriptions in the usual course of professional practice. The jury later returned a verdict finding Dr. Enmon guilty on all 92 counts.

After trial, Dr. Enmon requested that counsel be reappointed for sentencing. But Dr. Enmon disagreed with a sentencing memorandum prepared by his attorney (and its reference to the mental evaluation and report) and asked that the

6

memorandum be withdrawn and that counsel be excused.  Following a third *Faretta* colloquy, the district court granted Dr. Enmon's request to proceed *pro se*. The district court then varied below the government's requested sentence and the advisory guidelines, and it imposed a 240-month sentence.  Dr. Enmon now appeals.

## II

Dr. Enmon concedes that our review of his challenges to the jury instructions and the general verdict form is for plain error because he failed to object in the district court.  *See United States v. Moriarty*, 429 F.3d 1012, 1018–19 (11th Cir. 2005).  We have described plain error review as a "daunting obstacle," *see United States v. Pielago*, 135 F.3d 703, 708 (11th Cir. 1998), because a defendant must show that "there is (1) error, (2) that is plain, and (3) that affects substantial rights."  *Moriarty*, 429 F.3d at 1019.  "[I]f all three requirements are met, it is still within [our] discretion whether to correct the forfeited error." *Pielago*, 135 F.3d at 708.  The burden of establishing that an error affected substantial rights "is anything but easy[,]" and it ultimately requires a defendant to show that the error affected the outcome of the proceedings below.  *See United States v. Rodriguez*, 398 F.3d 1291, 1299 (11th Cir. 2005).

The Controlled Substances Act prohibits a physician from "knowingly or intentionally" dispensing controlled substances, *see* 21 U.S.C. § 841(a)(1), but

7

allows registered practitioners to dispense certain controlled substances with a valid prescription.  *See* § 829(a)-(b).  A prescription for a controlled substance is unlawful if a medical practitioner issues it without a legitimate medical purpose or outside of the "usual course of his professional practice."  *See* 21 C.F.R. § 1306.04(a).  We have held that a jury must determine from an objective standpoint whether a prescription was issued in the usual course of professional practice—that is, we look to whether the doctor's practice was "in accordance with a generally-accepted standard of medical practice."  *See United States v. Merrill*, 513 F.3d 1293, 1306 (11th Cir. 2008).

Dr. Enmon acknowledges that the district court correctly described the elements of an offense under § 841(a)(1), but claims it committed plain error by instructing the jury that his good faith belief was irrelevant to its determination of whether he had issued prescriptions in the "usual course of his professional practice."  In pertinent part, the district court gave the following instruction:

> Whether the Defendant acted outside the usual course of professional practice is to be judged *objectively* by reference to standards of medical practice generally recognized and accepted in the United States.  Therefore, whether the Defendant had a good faith belief that he dispensed a controlled substance in the usual course of his professional practice is irrelevant.

> However, whether the Defendant acted without a legitimate medical purpose depends on the Defendant's *subjective* belief about whether he was dispensing the controlled substance for a legitimate medical purpose.  Therefore, in order for the Government to establish that the Defendant was acting without [a] legitimate medical purpose, the

8

> Government must prove beyond a reasonable doubt that the Defendant did not subjectively believe that he was dispensing the controlled substance for a legitimate medical purpose.

Tr. of Trial Proceedings, D.E. 127, at 168 (emphasis added).

In support of his argument, Dr. Enmon primarily relies on our decision in *United States v. Tobin*, 676 F.3d 1264 (11th Cir. 2012). Dr. Enmon is correct that we observed in *Tobin* "that our precedent has not always been clear in specifying the standpoint from which a jury is to determine whether a prescription was 'issued . . . by an individual practitioner acting in the usual course of his professional practice.'" *Id.* at 1282 (citation omitted). We described the confusion by reviewing two prior cases where we held that a doctor's behavior "must be judged by an 'objective standard[,]' . . . [y]et . . . approved a charge that instructed the jury to consider whether the defendant had a 'good faith' belief that he was prescribing medicine" in line with that objective standard. *See id.* Even in light of that discrepancy, we held that our precedents, when "read . . . to form a coherent whole[,] . . . stand for the proposition that a jury must determine from an *objective* standpoint whether a prescription is made in the 'usual course of professional practice.'" *See id.* at 1282–83 (citations omitted).

Dr. Enmon misinterprets our analysis in *Tobin*, however, to mean that his good faith belief *was* relevant under the objective standard the jury was required to employ. The problem is that Dr. Enmon misses our ultimate conclusion in

9

*Tobin*—in that case, we affirmed the district court's rejection of the defendants' proposed jury instructions with regard to their "subjective beliefs that they were acting in the usual course of professional practice . . . because [the instructions] did not provide 'a correct statement of the law.'" *Id.* at 1283.

To the extent Dr. Enmon's subjective belief was relevant to the jury's decision, the district court correctly (and favorably) explained that whether Dr. Enmon dispensed controlled substances "for a legitimate medical purpose" could be viewed from a subjective standpoint. Dr. Enmon's argument that we have never (unequivocally) held that good faith is irrelevant to the objective standard required for the "usual course of his professional practice" analysis, without more, does not support a finding of plain error here.[3]

In addition, Dr. Enmon argues that the jury's general verdict form violated his due process rights under the Fifth Amendment because the district court was required to give the jury a special verdict form for each of the substantive counts. Dr. Enmon admits that he consented to the general verdict form, but argues that by listing the requirements for the *mens rea* element separately, the district court prevented the jury from reaching a unanimous verdict.

Specifically, Dr. Enmon claims that the district court erred by informing the jury that it could find he acted "knowingly and intentionally" by either issuing

---

[3] In any event, Dr. Enmon does not attempt to explain how the court's jury instruction impacted his substantial rights or the course of the proceedings below. *See Moriarty*, 429 F.3d at 1019.

10

prescriptions outside the usual course of professional practice or not for a legitimate purpose. The sole case upon which Dr. Enmon relies, *Schad v. Arizona*, 501 U.S. 624 (1991), does not support his argument. In *Schad*, the Supreme Court considered a general verdict instruction related to a state's first-degree murder statute that listed three alternative ways to commit the crime. *See id.* at 629–30. Writing for a plurality of the Court, Justice Souter recognized that "legislatures frequently enumerate alternative means of committing a crime without intending to define separate elements or separate crimes[,]" *see id.* at 636, and rejected the petitioner's due process challenge to his conviction under instructions that did not require the jury to agree on one of the alternative means. *See id.* at 643–45.

Here, the district court correctly instructed the jury that it could find Dr. Enmon guilty only if all of the elements were proven beyond a reasonable doubt. *See United States v. Griffin*, 705 F.2d 434, 437 (11th Cir. 1983) (noting that a special verdict form is often "disfavored" in criminal trials and is unnecessary where a court instructs a jury that they "would have to agree on all essential elements of the offense" charged). Dr. Enmon has therefore not established that the jury instruction or the special verdict form affected his substantial rights or the outcome of the proceedings below.

**III**

11

A district court's conclusion that a defendant has validly waived his right to counsel is a mixed question of law and fact that we review *de novo*. *See United States v. Cash*, 47 F.3d 1083, 1088 (11th Cir. 1995). When a defendant asserts his or her constitutional right to self-representation, "[t]he ultimate test is not the trial court's express advice, but rather the defendant's understanding" of the risks of self-representation. *Fitzpatrick v. Wainwright*, 800 F.2d 1057, 1065 (11th Cir. 1986). We have described several factors that impact a defendant's knowing and voluntary waiver of counsel including, but not limited to, a defendant's age, health, and education, a defendant's contact with an attorney prior to trial, a defendant's "knowledge of the nature of the charges and the possible penalty he [i]s subject to if convicted," a defendant's familiarity with courtroom procedure, and whether standby counsel is appointed and available to assist during the defendant's trial. *See id.* at 1065–66.

Dr. Enmon first argues that his standby counsel's leading questions about his age, education, professional experience, knowledge of the criminal charges, and lack of formal legal training during the initial *Faretta* hearing prevented the magistrate judge from having a meaningful discussion about the pitfalls of self-representation. Although it may have been better for the judge to conduct the initial questioning, the inquiry turns on whether those factors establish that a defendant understands the risks of self-representation. *See Fitzpatrick*, 800 F.2d at

1065.  Moreover, the judge took time after the attorney's questions to expressly advise Dr. Enmon that it is unwise to waive counsel and that a trained lawyer could better represent him, "just as it would be unwise for any person trained in law to try to practice medicine upon themselves."  Tr. of *Faretta* Hearing, D.E. 45, at 16. The judge then warned Dr. Enmon that he was not familiar with court procedures or the rules of evidence and asked him again if he still wanted to proceed *pro se*. Dr. Enmon said that he did, and the judge indicated that standby counsel would be available.  Dr. Enmon confirmed that he had made his decision freely and without improper influence, and he signed a written waiver.

Two months later, Dr. Enmon appeared for a pretrial hearing before the district court.  Although the district court referred to the initial hearing before the magistrate judge, it stated its intention to conduct a second *Faretta* hearing.  Like the magistrate judge, the district court gave Dr. Enmon a detailed, express warning about the dangers of self-representation in a complex federal criminal trial.  The district court also considered Dr. Enmon's education and experience, confirmed that Dr. Enmon understood the charges and possible penalties, described the trial process in detail, clarified that standby counsel is not "co-counsel," and asked standby counsel to guide Dr. Enmon on direct examination and cross-examination of witnesses.  Tr. of Pretrial Conference, D.E. 123, at 5–10, 12–14, 37.

13

Although Dr. Enmon agrees that an adequate waiver "depends on the particular facts and circumstances of each case," *see* Br. of Appellant at 64, his primary argument is that the colloquy in the district court closely resembled the inadequate *Faretta* hearing in *Cash*, 47 F.3d at 1088. But the *Faretta* colloquies in this case are distinguishable in important ways. First, in *Cash*, the district court granted the defendant's request to proceed *pro se* "on the *very day* of the trial." *Id.* (emphasis in original). Second, the court in *Cash* failed to consider defendant's knowledge of the charges and potential penalties he faced or his familiarity with courtroom procedure and evidentiary rules. *See id*. Lastly, and significantly, the district court "generally discouraged self-representation and made some inquiry into [the defendant's] reasons for wishing to represent himself" instead of conducting a searching inquiry to confirm that the waiver was made knowingly and intelligently. *Id.* Unlike the district court in *Cash*, both the magistrate judge and district court here—in two separate hearings that occurred before trial— conducted a thorough inquiry to ensure that Dr. Enmon understood the risks of the self-representation.

As to the sentencing hearing, Dr. Enmon claims that the district court granted his request to proceed *pro se* after only a brief exchange. *See* Br. of Appellant at 15. But this claim is refuted by the record. The district court expressly stated that "[a]lthough, conceivably, [it] could travel on the prior *Faretta*

14

hearing," the court decided it would instead "reinstitute certain questions and make sure that, again, at this juncture . . . [Dr. Enmon's] decision [wa]s made knowingly, intelligently, and voluntarily."  Tr. of Sentencing Hearing, D.E. 128, at 7.  In the same way it had done before trial, the district court explained that Dr. Enmon would be treated as an attorney, held to the rules of procedure, and that Dr. Enmon faced "very stiff penalties" at the sentencing proceeding.  *Id.* at 8–9.  The district court then asked whether Dr. Enmon had reviewed the presentence investigation report and discussed it with his attorney and whether Dr. Enmon understood that the PSI had recommended a sentence of 360 months' imprisonment, while the advisory guidelines recommended up to 16,260 months' imprisonment.  *See id.* at 9.  The district court then confirmed that Dr. Enmon was well-educated and that he had represented himself during trial and on previous occasions.  Finally, the district court warned Dr. Enmon again that a trained lawyer could better represent him and asked Dr. Enmon if he understood the disadvantages of choosing to represent himself.  Dr. Enmon responded, for a third time, that he understood and that he wanted to exercise his constitutional right to self-representation.  *See id.* at 10.

In three separate *Faretta* hearings, Dr. Enmon was warned of the dangers of self-representation and reminded of the seriousness of the charges against him and the penalties he faced, and he swore under oath each time that he understood the risks and that his waiver was knowing and voluntary.  The district court therefore

15

did not err by observing Dr. Enmon's constitutional right to self-representation and by granting his request to waive counsel during trial and at sentencing.

## IV

We generally review *de novo* whether the evidence was sufficient to sustain a conviction. *See United States v. Gunn*, 369 F.3d 1229, 1234 (11th Cir. 2004). But where, as here, a defendant fails to move for a judgment of acquittal or renew such motion at the close of the evidence, that error "operates as a waiver . . . and forecloses any review of the sufficiency of the evidence except where a miscarriage of justice would result." *United States v. Tapia*, 761 F.2d 1488, 1492 (11th Cir. 1985) (internal citation and quotation marks omitted). We have interpreted this standard to require "a finding that 'the evidence on a key element of the offense is so tenuous that a conviction would be shocking.'"[4] *Id.*

In analyzing the sufficiency of the evidence, we view the evidence in the light most favorable to the government and accept all reasonable inferences in favor of the jury's verdict. *See United States v. Hernandez*, 433 F.3d 1328, 1335 (11th Cir. 2005). "[A] jury may find that a doctor violated the [Controlled Substances] Act from evidence received from lay witnesses surrounding the facts

---

[4] After the government rested its case, the district court expressly asked Dr. Enmon if he wanted to move for a judgment of acquittal, but he declined to do so. Tr. of Trial Proceedings, D.E. 127, at 20. Following the jury's verdict, Dr. Enmon's standby counsel filed a one-page motion for a new trial, and the court ordered Dr. Enmon to file briefing to support the motion. Dr. Enmon chose not to and instead filed a *pro se* motion to vacate his conviction claiming the magistrate judge had improperly issued warrants against him.

16

and circumstances of the prescriptions." *United States v. Joseph*, 709 F.3d 1082, 1100 (11th Cir. 2013) (internal citation and quotation marks omitted). Moreover, a "jury has exclusive province over [weighing the credibility of witnesses] and [we] may not revisit this question." *United States v. Chastain*, 198 F.3d 1338, 1351 (11th Cir. 1999).

To support his insufficiency claim, Dr. Enmon's only argument is that the government failed to present evidence regarding the applicable medical standards in Georgia, and that the error precluded the jury from finding that he did not prescribe medication for "a legitimate medical purpose" because the jury had no reliable benchmark by which to judge the allegations against him. *See* Br. of Appellant at 71. But the state's standard of medical care is not a necessary element of the federal offense, and Dr. Enmon has not pointed to evidence "on a key element of the offense" that is "so tenuous" as to establish manifest injustice. *Tapia*, 761 F.2d at 1488. *See also Joseph*, 709 F.3d at 1096 (rejecting, on plain error review, an objection to a jury instruction that measured conduct of a physician objectively based on generally accepted standards in the United States).

Irrespective of Georgia's medical standards, the jury was presented with sufficient evidence to infer that Dr. Enmon acted outside the scope of professional practice and without a legitimate medical purpose in issuing prescriptions. Several lay witnesses described the events that led to Dr. Enmon's arrest and stated that

17

Dr. Enmon prescribed large amounts of medications after conducting cursory examinations of patients. Other witnesses testified that Dr. Enmon knew or should have known that his patients were abusing prescription drugs and that long lines formed outside the clinics each day. The government also elicited expert testimony from two witnesses who reported that Dr. Enmon's methods were not within the usual course of professional practice and that the overwhelming majority of Dr. Enmon's prescriptions were not medically indicated. Significantly, Dr. Enmon's former supervisor at Brunswick Wellness, Mr. Colandrea, and the clinic's former manager testified that they intended to run Brunswick Wellness as a "pill mill." Moreover, several of Dr. Enmon's former patients corroborated the testimony of other witnesses by admitting that they sought medications they did not need.

In sum, at least 28 witnesses testified about specific facts establishing that Dr. Enmon's practice of prescribing medications was not legitimate or not based on comprehensive medical examinations of patients. And finally, Dr. Enmon testified on his own behalf and claimed that he did not act outside of the usual course of professional practice. It was the province of the jury to discredit that testimony and credit the testimony of the other witnesses. *See Joseph*, 709 F.3d at 1100. Dr. Enmon therefore has not met the "miscarriage of justice" standard here.

**V**

18

Dr. Enmon's final argument is that his 240-month sentence is substantively unreasonable.  We review the reasonableness of a sentence under a deferential abuse of discretion standard.  *See Gall v. United States*, 552 U.S. 38, 41 (2007). The party challenging the sentence bears the burden of showing that it is substantively unreasonable in light of the record and the § 3553(a) factors.  *See United States v. Tome*, 611 F.3d 1371, 1378 (11th Cir. 2010).  We will vacate a sentence only if "we are left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of the case."  *United States v. Irey*, 612 F.3d 1160, 1190 (11th Cir. 2010) (en banc) (internal quotation marks and citation omitted).

A district court "shall impose a sentence sufficient, but not greater than necessary to comply with the purposes" listed in § 3553(a), including the need "to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant [and] to provide the defendant with needed . . . correctional treatment in the most effective manner."   18 U.S.C. § 3553(a)(2)(B)-(D). Additional factors include "the nature and circumstances of the offense and the history and characteristics of the defendant . . . [and] the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." *Id.* at §§ 3553(a)(1), (6).  There is no unwarranted

19

disparity, however, "when a cooperating defendant pleads guilty and receives a lesser sentence than a defendant who proceeds to trial." *United States v. Langston*, 590 F.3d 1226, 1237 (11th Cir. 2009). A court must consider significant distinctions and it "should not draw comparisons to cases involving defendants who were convicted of less serious offenses." *See United States v. Jayyousi*, 657 F.3d 1085, 1118 (11th Cir. 2011).

Dr. Enmon's primary argument is that the drug guideline was drafted "with a view towards illicit drug dealers and not doctors who have been convicted of prescribing [medications] outside the usual course of professional practice." Br. of Appellant at 75. In Dr. Enmon's view, doctors do not need deterrence in the same way as "hardened drug dealers from the streets." *Id.*

Dr. Enmon's sentence of 240 months' imprisonment, however, is well below the advisory guidelines' recommendation of 16,260 months based on the large amount of controlled substances that Dr. Enmon prescribed, and that variance is an indicator of reasonableness. *See, e.g.*, *United States v. Hunt*, 526 F.3d 739, 746 (11th Cir. 2008) (highlighting that we expect a sentence within the advisory guideline range to be reasonable).[5] Moreover, the district court stated that the advisory guideline range was "astounding" and "obviously far too much." Tr. of

---

[5] At sentencing, the government alluded to the evidence presented at trial indicating that Dr. Enmon wrote up to "155 prescriptions and [saw] 42 patients a day." Tr. of Sentencing Hearing, D.E. 128 at 39.

20

Sentencing Hearing, D.E. 128 at 50. The district court was not unsympathetic to Dr. Enmon's legitimate concern about his inability to practice medicine; instead, it balanced Dr. Enmon's history and characteristics with the specific facts and circumstances of his offense. The district court also referenced its need to "find a punishment that is sufficient, but not greater than necessary, to accomplish the purposes of the punishment." *Id.* And finally, the district court noted that although a forensic report indicated Dr. Enmon had "anti-social [and] narcicisstic personality characteristics," it was not going to hold those findings against Dr. Enmon or allow the report to impact its sentencing decision. *See id.* at 51.

Dr. Enmon also argues that the district court abused its discretion by ignoring his sentencing disparity claim under § 3553(a)(6). But Dr. Enmon has not met his burden of presenting a suitable, comparable case. The only comparable defendant that Dr. Enmon offers is a co-conspirator, Mr. Colandrea. But Mr. Colandrea's situation is distinguishable because he pled guilty to conspiracy, accepted responsibility for the crime, and substantially assisted in the investigation and prosecution of others related to the "pill mill" operation. *See Langston*, 590 F.3d at 1237. *See also United States v. Williams*, 526 F.3d 1312, 1323 (11th Cir. 2008) (noting that a defendant's situation is not comparable to a co-conspirator who pleads guilty and assists the government). In exchange, the government moved for a downward departure and the district court was within its discretion to

21

reduce Mr. Colandrea's sentence.  Without a comparable defendant—one with a similar record, who has been found guilty of similar criminal conduct—there cannot be a proper comparison of sentences under § 3553(a)(6).  *See Langston*, 590 F.3d at 1237.  *See also United States v. Martin*, 455 F.3d 1227, 1241 (11th Cir. 2006) (refusing to compare sentences without "a valid comparator").

Because Dr. Enmon has not demonstrated that his sentence was substantively unreasonable in light of the record and the § 3553(a) factors, we affirm his 240-month sentence.

## VI

Dr. Enmon has not established that the district court plainly erred in instructing the jury or providing the jury with a general verdict form, that the district court erred in allowing him to proceed *pro se*, that the jury's verdict was manifestly unjust in light of the evidence presented, or that the district court imposed a substantively unreasonable sentence.  We therefore affirm Dr. Enmon's convictions and sentence.

**AFFIRMED.**